IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE

JULIAN BODNARI
     Petitioner         (

     V.              (

THOMAS CARROLL,WARDEN     (       C.A. No.        .57

DELAWARE CORRECTIONAL and,  (

CARL DANBERG, ATTORNEY GENERAL,(

STATE OF DELAWARE       (

                       (

                       (

                       (

                       (

APPENDIX



FILED

APR 2 0 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

DATE: April 12, 2006

JULIAN BODNARI
1181 PADDOCK RD.
SMYRNA DE. 19977

TABLE OF CONTENTS

PAGE

EXHIBIT-A
SUPERIOR COURT  DOCKET...............................................A-1-12
EXHIBIT-B
Memorandum of Law in support of MOTION  FOR A NEW TRIAL.............B-1-2
Petitioner Reply in support of MOTION FOR A NEW TRIAL...............B-3-7
EXHIBIT-C
WITHERELL Affdavit in respose  to Petitioner  MOTION FOR POST
CONVICTION RELIEF..................................................C-1-3
EXHIBIT-D
SUPERIOR COURT DECISION PAGE 10....................................D-1
EXHIBIT-E
DET. GOODE  interview of GARCIA on  MARCH 10-2000..................E-1-30
TRAIL  TRANSCRIPTS
GARCIA-CROSS.......................................................B-226
WITHERELL  arguments at first MOTION FOR  AQUITAL at the end of
STATE CASE.........................................................C-124-125

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    1
                      ( as of  05/31/2005 )
```

State of Delaware v.  JULIAN BODNARI                     DOB: 02/06/1970
State's Atty: ADAM D GELOF , Esq.          AKA: MIKE L ALLEN
Defense Atty: ANDREW J WITHERELL , Esq.         MIKE L ALLEN


Assigned Judge:

Charges:

| Count | DUC# | Crim.Action# | Description | Dispo. | Dispo. Date |
|-------|------|--------------|-------------|--------|-------------|
| 001 | 9909027880 | IS99100272 | TRF.COC.>100 GR | TG | 07/14/2000 |
| 002 | 9909027880 | IS99100273 | PFDCF | TG | 07/14/2000 |
| 003 | 9909027880 | IS99100274 | PWITD NSI CCS | TG | 07/14/2000 |
| 004 | 9909027880 | IS99100275 | MAINT VEHICLE | TNG | 07/14/2000 |
| 005 | 9909027880 | IS99100276 | CCDW | TG | 07/14/2000 |
| 006 | 9909027880 | IS99100277 | POSS DRUG PARAP | TNG | 07/14/2000 |
| 007 | 9909027880 | S99100278 | POSS,USE MARIJ. | NOLP | 07/12/2000 |
| 008 | 9909027880 | S99100279 | PFBPP | NPL | 07/14/2000 |
| 009 | 9909027880 | IS99100280 | FORGERY 2ND | TG | 07/14/2000 |
| 010 | 9909027880 | IS99100281 | FORGERY 2ND | TG | 07/14/2000 |
| 011 | 9909027880 | IS99100282 | FORGERY 2ND | TG | 07/14/2000 |
| 012 | 9909027880 | IS99100283 | FORGERY 2ND | TG | 07/14/2000 |
| 013 | 9909027880 | IS99100284 | FORGERY 2ND | TG | 07/14/2000 |
| 014 | 9909027880 | S99100285 | FORGERY 2ND | NOLP | 07/12/2000 |
| 015 | 9909027880 | IS99100286 | FORGERY 2ND | TG | 07/14/2000 |
| 016 | 9909027880 | IS99100287 | CONSP 2ND | TG | 07/14/2000 |
| 017 | 9909027880 | S99100288 | TAM W/P/REC 2ND | NPL | 07/14/2000 |
| 018 | 9909027880 | S99100289 | TAM W/P/REC 2ND | NPL | 07/14/2000 |
| 019 | 9909027880 | S99100290 | TAM W/P/REC 2ND | NPL | 07/14/2000 |
| 020 | 9909027880 | S99100291 | TAM W/P/REC 2ND | NPL | 07/14/2000 |
| 021 | 9909027880 | IS99100292 | CRIM IMPERSON | TG | 07/14/2000 |
| 022 | 9909027880 | S99100293 | CRIM IMPERSON | NPL | 07/14/2000 |
| 023 | 9909027880 | IS99100294 | INS-DEL LAWS | TG | 07/14/2000 |
| 024 | 9909027880 | IS99100295 | NO VALID LICENS | TG | 07/14/2000 |
| 025 | 9909027880 | IS99100296 | POSS FICT LIC | TG | 07/14/2000 |
| 026 | 9909027880 | S99100297 | OPER VEH TINT | NOLP | 07/14/2000 |
| 027 | 9909027880 | IS99110461 | SPDING(>55MPH) | TG | 07/14/2000 |

| No. | Event Date | Event | Judge |
|-----|-----------|-------|-------|
| 1 | 10/21/1999 | CASE ACCEPTED IN SUPERIOR COURT. | |

```
1    10/21/1999
          CASE ACCEPTED IN SUPERIOR COURT.
          ARREST DATE:
          PRELIMINARY HEARING DATE: 09/30/1999
          BAIL:
          HELD ON CASH BAIL              1998800.00 100
2    11/08/1999
```

*Ex. A*

```
                  SUPERIOR COURT CRIMINAL DOCKET              Page    2
                     ( as of  05/31/2005 )
```

State of Delaware v.  JULIAN BODNARI                    DOB: 02/06/1970
State's Atty: ADAM D GELOF , Esq.          AKA: MIKE L ALLEN
Defense Atty: ANDREW J WITHERELL , Esq.         MIKE L ALLEN

```
      Event
No.   Date          Event                           Judge
--------------------------------------------------------------------------------
      TRANSCRIPT OF PRELIMINARY HEARING FILED.
3     11/10/1999
      MOTION FOR PRO HAC VICE FILED BY RONALD PHILLIPS, ESQ.
5     11/12/1999
      MOTION FOR ADMISSION PRO HAC VICE GRANTED BY JUDGE GRAVES FOR KENNETH
      MELVIN, ESQ THROUGH RONALD D. PHILLIPS, ESQ.
4     11/15/1999
      INDICTMENT, TRUE BILL FILED.
6     11/23/1999
      DISCOVERY REQUEST FILED BY RON PHILLIPS.
8     12/03/1999                                 STOKES RICHARD F.
      ARRAIGNMENT CALENDAR - DEFENDANT WAIVED READING; ENTERED PLEA OF NOT
      GUILTY; JURY TRIAL DEMANDED.
      CASE REVIEW IS 1/18/2000.
7     12/09/1999
      DISCOVERY REQUEST FILED BY RONALD PHILLIPS.
9     12/17/1999
      CASE CONSOLIDATED WITH:_ID # 9909025239 (S99-10-0279  - 0297 ) DUE TO
      THE INDICTMENT FILED BY THE DEPT. OF JUSTICE ON 11/15/99.  LETTER SENT
      TO ATTORNEYS AND CASE SCHEDULING OFFICE NOTIFYING THEM OF THE CONSOLI-
      DATION.  ORIGINAL PAPERWORK FROM ID # 9909025239 IS NOW A PART OF THIS
      FILE UNDER DOCKET ENTRY # 9.
10    01/04/2000
      BRADY MATERIAL, REQUEST FOR.  FILED BY RON PHILLIPS.
11    01/18/2000
      CASE REVIEW CALENDAR CONTINUED
      DEFENDANT'S REQUEST-NEW ATTY.
12    01/18/2000
      CASE REVIEW CALENDAR CONTINUED
      DEFENDANT'S REQUEST-NEW ATTY.
13    02/01/2000
      MOTION TO WITHDRAW AS COUNSEL FILED BY RONALD PHILLIPS, TO BE
      PRESENTED 2/4/00.
14    02/04/2000                                 STOKES RICHARD F.
      MOTION TO WITHDRAW AS COUNSEL GRANTED.
15    02/08/2000                                 GRAVES T. HENLEY
      CASE REVIEW CALENDAR:  SET FOR FINAL CASE REVIEW 4-6-2000
16    03/27/2000
      SUBPOENA (7) SUSSEX COUNTY
17    04/03/2000
      E-MAIL FROM CASE SCHEDULING OFFICE TO COURT RE:  SUPPRESSION HEARING
      FOR DEFENDANT IS SCHEDULED FOR 5/4/2000, AT 9:00 A.M.
```

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    3
                       ( as of  05/31/2005 )

State of Delaware v.  JULIAN BODNARI                    DOB: 02/06/1970
State's Atty: ADAM D GELOF , Esq.          AKA: MIKE L ALLEN
Defense Atty: ANDREW J WITHERELL , Esq.         MIKE L ALLEN

      Event
No.   Date          Event                            Judge
-----------------------------------------------------------------------
18    04/03/2000
      CONTINUANCE REQUEST FILED BY DEFENSE ATTY. WITHERALL - MR. WITHERALL'S
      FATHER-IN-LAW PASSED AWAY AND IS NOT AVAILABLE THE DAY OF TRIAL. ***
      GRANTED BY CSO - TRIAL CONTINUED TO 5/22/00 AT 9:00 A.M. AND FINAL
      CASE REVIEW WILL BE 5/17/00 AT 9:30 A.M.***
19    04/03/2000
      ENTRY OF APPEARANCE BY A. WITHERELL, ESQ.
20    04/03/2000
      NOTICE OF SERVICE (REQUEST FOR DISCOVERY) FILED BY A. WITHERELL, ESQ.
21    04/03/2000
      MOTION TO SUPPRESS FILED BY A. WITHERELL, ESQ.
      TO BE HEARD 5-6-00.
23    04/05/2000
      SUBPOENA(S) ISSUED._SUSSEX (2)
22    04/11/2000
      SUBPOENA(2) ISSUED/SUSSEX COUNTY SHERIFF.
24    05/01/2000
      CONTINUANCE REQUEST FILED BY A. GELOF, DAG.
25    05/03/2000
      SUPPLEMENT TO DISCOVERY FILED BY AG GELOF
27    05/03/2000
      LETTER FROM ANDRES WITHERBELL TO JUDGE GRAVES RE:  REQUESTING THE
      SUPPRESSION HEARING BE RESCHEDULED / PER JUDGE BRADLEY ON 5/3/2000 -
      THE REQUEST TO CONTINUE THE SUPPRESSION HEARING IS DENIED.
26    05/04/2000                              BRADLEY E. SCOTT
      MOTION TO SUPPRESS RESERVED DECISION (COUNSEL TO SUBMIT CASE LAW TO
      THE COURT BY FRIDAY 5-5-00).
28    05/10/2000
      CONTINUANCE REQUEST FILED BY DAG GELOF - INVESTIGATING OFFICER IS OUT
      OF THE STATE ON VACATION.  ***GRANTED BY CSO - TRIAL CONTINUED TO
      7/10/00 AND FINAL CASE REVIEW WILL BE 7/6/00.***
34    05/11/2000
      LETTER FROM DAG/GELOF, TO COURT.  RE:  SUPPLEMENT TO THE RECORD FOR
      THE SUPPRESSION HEARING.
35    06/08/2000
      LETTER FROM A. WITHERELL, TO COURT.  RE:  ENCLOSING DECISION IN STATE
      V. MARTINS.
29    06/22/2000
      SUBPOENA(1) ISSUED/NEW CASTLE COUNTY SHERIFF.
30    06/22/2000
      SUBPOENA(7) ISSUED/SUSSEX COUNTY SHERIFF.
31    06/27/2000
```

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    4
                       ( as of  05/31/2005 )
```

State of Delaware v.  JULIAN BODNARI                    DOB: 02/06/1970
State's Atty: ADAM D GELOF , Esq.          AKA: MIKE L ALLEN
Defense Atty: ANDREW J WITHERELL , Esq.         MIKE L ALLEN

```
        Event
No.     Date           Event                              Judge
-----------------------------------------------------------------------------
        LETTER FROM COURT, TO DEF.  RE:  DEF. IS TO BE BROUGHT BEFORE THE
        COURT ON 7/6/00 FOR JUDGE BRADLEY TO RENDER HIS DECISION REGARDING
        THE MOTION TO SUPPRESS.
36      07/06/2000                               BRADLEY E. SCOTT
        MOTION TO SUPPRESS DENIED.
32      07/10/2000
        TRANSCRIPT (SUPPRESSION HEARING) FILED.
37      07/10/2000
        MOTION TO SEVER FILED BY A. WITHERELL.
38      07/10/2000
        VOIR DIRE QUESTIONS FILED BY A. WITHERELL.
39      07/10/2000
        JURY SELECTED.
40      07/10/2000
        VOIR DIRE QUESTIONS FILED.
41      07/10/2000                               BRADLEY E. SCOTT
        TRIAL CALENDAR- WENT TO TRIAL JURY - COURT BEGAN:  12:31.  COURT
        REPORTER - PURNELL.  COURT CLERK - DOTSON.  STATE DROPS COUNT 8
        (S99-10-0279) OF THE INDICTMENT.
42      07/11/2000                               BRADLEY E. SCOTT
        TRIAL CALENDAR- WENT TO TRIAL JURY - COURT BEGAN:  9:20 AM.  COURT
        REPORTER - KIMMEL.  COURT CLERK - DOTSON.  DEFENSE REQUESTS POLLING OF
        THE JURY.  COURT DENIES POLLING OF THE JURY RE:  JUROR THAT WAS EX-
        CUSED.
33      07/12/2000
        AMENDED INDICTMENT FILED BY STATE.
43      07/12/2000                               BRADLEY E. SCOTT
        TRIAL CALENDAR- WENT TO TRIAL JURY - COURT BEGAN:  9:04 AM.  COURT
        REPORTER - PURNELL.  COURT CLERK - CHAMBERS.  STATES WILL NOLLE PROSS
        COUNTS 7 (S99-10-0278) AND 14 (S99-10-0285), AND WILL FILE AN AMENDED
        INFORMATION.  COUNT # 8 WAS SEVERED.  MOTION FOR JUDGMENT OF ACQUIT-
        TAL MADE BY DEFENSE.  MOTIONS DENIED AS TO ALL COUNTS OF AMENDED
        INDICTMENT.
44      07/13/2000                               BRADLEY E. SCOTT
        TRIAL CALENDAR- WENT TO TRIAL JURY - COURT BEGAN:  11:20 AM.  COURT
        REPORTER - KIMMEL.  COURT CLERK - DOTSON.
47      07/13/2000                               BRADLEY E. SCOTT
        LETTER FROM JUDGE BRADLEY TO JUDGE VAUGHN RE:  ADVISING MR. WITHERELL
        WILL BE IN TRIAL ON THIS CASE.  IT IS HIS UNDERSTANDING THAT HE HAS
        SEVERAL CASE REVIEWS AND A HEARING AT 11:00 AM SCHEDULED IN SUPERIOR
        COURT KENT COUNTY.  JUDGE BRADLEY ASKS THAT HE ADVISE IF THERE WILL BE
        ANY PROBLEMS CONTINUING THESE MATTERS FOR MR. WITHERELL.
```

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    5
                       ( as of  05/31/2005 )

State of Delaware v.  JULIAN BODNARI                    DOB: 02/06/1970
State's Atty: ADAM D GELOF , Esq.          AKA: MIKE L ALLEN
Defense Atty: ANDREW J WITHERELL , Esq.         MIKE L ALLEN


      Event
No.   Date         Event                          Judge
-----------------------------------------------------------------------------
51    07/13/2000
      AMENDED INDICTMENT FILED
45    07/14/2000                              BRADLEY E. SCOTT
      JURY TRIAL - DEFENDANT FOUND GUILTY/PSI ORDERED.   SENTENCING SET FOR
      AUGUST 25, 2000.  COURT BEGAN:  9:20AM.  COURT REPORTER - KIMMEL.
      COURT CLERK - WILSON.  BAIL REVOKED.
46    07/14/2000                              BRADLEY E. SCOTT
      COMMITMENT TO DEPARTMENT OF CORRECTION.
      DEFENDANT'S BOND IS REVOKED.  HELD WITHOUT BAIL.
48    07/26/2000
      MOTION FOR JUDGMENT OF ACQUITTAL FILED BY ANDREW WITHERELL.  SENT FILE
      TO CHAMBERS ON 7/26/00.
49    07/26/2000
      MOTION FOR NEW TRIAL FILED BY ANDREW WITHERELL/SENT FILE TO CHAMBERS
      ON 7/26/00.
50    08/16/2000
      TRIAL CALENDAR- WENT TO TRIAL JURY
52    08/23/2000
      LETTER FROM COURT TO ADAM GELOF AND ANDRE WITHERELL RE:  NOTIFYING
      THEM THAT SENTENCING IS SCHEDULED FOR 9/8/00, AND THAT ANY DOCUMENTA-
      TION OR RESPONSES TO THE MOTION FOR JUDGMENT OF ACQUITTAL OR MOTION
      FOR NEW TRIAL SHALL BE FILED WITH THE COURT PRIOR TO TUESDAY,
      SEPTEMBER 5, 2000.
53    09/06/2000
      LETTER FROM ADAM GELOF TO E. SCOTT BRADLEY RE:  RESPONSE TO DEFENDANTS
      MOTION FOR NEW TRIAL AND JUDGMENT OF ACQUITTAL.
54    09/19/2000                              BRADLEY E. SCOTT
      BRIEF SCHEDULE FOR DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL AND
      MOTION FOR NEW TRIAL:
            DEFENDANT'S OPENING BRIEF:  3 WEEKS AFTER THE PREPARATION OF THE
                                        TRANSCRIPT
            STATE'S ANSWERING BRIEF:    2 WEEKS AFTER RECEIPT OF OPENING
                                        BRIEF.
            DEFENDANT'S REPLY BRIEF:    2 WEEKS AFTER RECEIPT OF THE ANSWER-
                                        ING BRIEF.
      THE COURT REPORTER ADVISED THAT THE TRANSCRIPT WILL TAKE APPROXIMATELY
      2 WEEKS TO PREPARE.  HE ASSUMES THAT MR. WITHERELL WILL REQUEST IT.
55    11/02/2000
      LETTER FROM COURT TO ANDREW WITHERELL AND ADAM GELOF RE:  AN OFFICE
      CONFERENCE HAS BEEN SCHEDULED FOR NOVEMBER 8, 2000, AT 8:45 A.M. WITH
      JUDGE BRADLEY TO DISCUSS THE STATUS OF THE BRIEFING SCHEDULE ORDERED
      PURSUANT TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL AND MOTION
```

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    6
                      ( as of  05/31/2005 )
```

State of Delaware v.  JULIAN BODNARI                    DOB: 02/06/1970
State's Atty: ADAM D GELOF , Esq.          AKA: MIKE L ALLEN
Defense Atty: ANDREW J WITHERELL , Esq.         MIKE L ALLEN

```
       Event
No.    Date          Event                          Judge
-----------------------------------------------------------------------------
       FOR NEW TRIAL.
56     11/09/2000
       LETTER FROM COURT TO COUNSEL RE: OFFICE CONFERENCE W/DEFENDANT ON
       11/8/00.
57     11/22/2000
       DEFENDANT'S LETTER FILED.
       TO COURT RE:  REQUESTING A COPY OF HIS COURT DOCKET / MAILED TO
       DEFENDANT ON 11/27/00.
58     12/08/2000
       LETTER FROM ANDREW WITHERELL TO JUDGE BRADLEY RE: TRANSCRIPT FOR THE
       DEFENDANT.
59     12/15/2000
       LETTER FROM JUDGE BRADLEY TO ANDREW WITHERELL RE: TRANSCRIPT WILL BE
       AVAILABLE IN FEBRUARY.
60     03/16/2001
       DEFENDANT'S LETTER FILED.
       TO JUDGE BRADLEY RE:  TRANSCRIPTS / LETTER FORWARDED TO CHAMBERS ON
       3/16/01.
61     03/23/2001                          BRADLEY E. SCOTT
       LETTER FROM JUDGE BRADLEY TO DEFENDANT RE:  ADVISING DEFENDANT AS HE
       IS REPRESENTED BY COUNSEL, HIS LETTER FILED 3/16/01, HAS BEEN FORWARD-
       ED TO HIS ATTORNEY, MR. WITHERALL, FOR ANY ACTION DEEMED NECESSARY.
62     04/09/2001
       TRANSCRIPT OF PROCEEDING OF COURT'S DECISION ON SUPPRESSION HEARING
       HELD IN SUPERIOR COURT ON THURSDAY, JULY 6, 2000, BEFORE JUDGE
       BRADLEY FILED BY EILEEN G. KIMMEL.
63     04/09/2001
       TRANSCRIPT OF PROCEEDINGS OF THE TRIAL HELD ON JULY 11, 2000 BEFORE
       JUDGE BRADLEY FILED BY EILEEN KIMMEL.
64     04/09/2001
       TRANSCRIPT OF PROCEEDING HELD ON JULY 13, 2000 HEARD BEFORE JUDGE
       BRADLEY FILED BY EILEEN KIMMEL.
65     04/09/2001
       TRANSCRIPT OF PROCEEDINGS HELD IN SUPERIOR COURT ON JULY 14, 2000,
       BEFORE JUDGE BRADLEY FILED BY EILEEN KIMMEL.
66     04/12/2001
       TRANSCRIPT OF PROCEEDINGS (VOLUME A) HELD IN SUPERIOR COURT ON 7/10/00
       BEFORE JUDGE BRADLEY FILED BY KATHY PURNELL
67     04/12/2001
       TRANSCRIPT OF FURTHER TRIAL (VOLUME C) HELD IN SUPERIOR COURT ON
       7/12/00 BEFORE JUDGE BRADLEY FILED BY KATHY PURNELL
68     05/22/2001
```

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    7
                       ( as of   05/31/2005 )

State of Delaware v.  JULIAN BODNARI                    DOB: 02/06/1970
State's Atty: ADAM D GELOF , Esq.          AKA: MIKE L ALLEN
Defense Atty: ANDREW J WITHERELL , Esq.          MIKE L ALLEN

       Event
No.    Date            Event                          Judge
-----------------------------------------------------------------------------
       LETTER FROM ATTORNEY TO COURT RE: REQUESTING A CONTINUANCE TO FILE OP-
       ENING BRIEF(S) IN THE ABOVE ACTION.
69     05/25/2001                            BRADLEY E. SCOTT
       LETTER FROM COURT TO ATTORNEY RE: THE COURT IS IN RECEIPT OF YOUR RE-
       CENT LETTER. BASED UPON THE DELAY IN PREPARING YOUR TRANSCRIPTS, YOU
       HAVE UNTIL 7/9/01 TO FILE YOUR OPENING BREIF.
70     07/06/2001
       LETTER FROM ANDREW J. WITHERELL, ESQ. TO COURT RE: REQUESTING THE COU-
       RT ALLOW HIM UNTIL 7/23/01 TO SUBMIT OPENING BRIEFS. APPROVED BY JUDGE
       BRADLEY ON 7/9/01.(INITIAL REQUEST RECEIVED VIA E-MAIL)
71     07/27/2001
       DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR JUDGMENT OF
       ACQUITTAL FILED BY ANDREW WITHERELL.
72     07/27/2001
       DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR NEW TRIAL FILED
       BY ANDREW J. WITHERELL.
73     07/27/2001
       LETTER FROM ANDREW WITHERELL TO JUDGE BRADLEY RE:  ATTACHING A
       COURTESY COPY OF THE DOCUMENTS SUBMITTED TO THE COURT FOR
       CONSIDERATION IN SUPPORT OF MR. BODNARI'S MOTION FOR NEW TRIAL AND
       MOTION FOR JUDGMENT OF ACQUITTAL.
74     08/16/2001
       LETTER FROM ADAM GELOF TO ANDREW WITHERALL
       RE: STATE IS INTERESTED IN RECEIVING A COPY OF ATTACHMENTS FOR CASE
75     09/17/2001
       DEFENDANT'S LETTER FILED.
       TO JUDGE BRADLEY
76     09/19/2001                            BRADLEY E. SCOTT
       LETTER FROM JUDGE BRADLEY TO DEFENDANT RE:  ADVISING DEFENDANT AS HE
       IS REPRESENTED BY COUNSEL, HIS LETTER DATED 9/12/01, HAS BEEN FORWARDE
       ED TO HIS ATTORNEY , MR. WITHERELL, FOR ANY ACTION DEEMED APPROPRIATE
       BY HIM .
77     10/26/2001                            BRADLEY E. SCOTT
       LETTER FROM ADAM GELOF TO JUDGE BRADLEY RE:  REQUESTING AN EXTENSION
       IN THE BRIEFING SCHEDULING CONCERNING THE MOTIONS FOR ACQUITTAL AND
       NEW TRIAL / APPROVED BY JUDGE BRADLEY ON 10/29/01.
78     01/02/2002
       NOTICE OF REPLY TO MOTION FOR JUDGMENT OF ACQUITTAL, MOTION FOR NEW
       TRIAL FILED BY ADAM GELOF, ESQ.
79     01/07/2002
       STATE'S RESPONSE TO MOTION FOR NEW TRIAL FILED BY ADAM GELOF.
       LARGE BLACK BOOK AS APPENDIX TO BRIEF.
```

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    8
                       ( as of  05/31/2005 )
```

```
State of Delaware v.  JULIAN BODNARI                  DOB: 02/06/1970
State's Atty: ADAM D GELOF , Esq.           AKA: MIKE L ALLEN
Defense Atty: ANDREW J WITHERELL , Esq.           MIKE L ALLEN
```

| No. | Event Date | Event | Judge |
|-----|------------|-------|-------|
| 80 | 01/10/2002 | LETTER FROM ELENA DELONG(DEFENDANT'S SISTER) TO COURT RE: OPENING AND ANSWERINGS BRIEFS ON HER BROTHER'S MOTIONS. | |
| 81 | 01/15/2002 | LETTER FROM COURT TO ELENA DELONG(DEFENDANT'S SISTER) RE: ADVISING THE COURT HAS RECEIVED THE OPENING AND ANSWERING BRIEFS ON YOUR BROTHER'S MOTIONS. THE COURT IS WAITING FOR MR. WITHERELL'S REPLY BRIEF, ONCE RECEIVED A DECISION WILL BE MADE WITHIN 90 DAYS. | BRADLEY E. SCOTT |
| 82 | 02/12/2002 | LETTER FROM COURT TO ANDREW J. WITHERELL, ESQ. RE: YOUR REPLY IS LONG OVERDUE. PLEASE LET ME KNOW IF YOU ARE GOING TO FILE A REPLY BRIEF AND WHEN. THANK YOU FOR YOUR PROMPT ATTENTION TO THIS MATTER. | BRADLEY E. SCOTT |
| 83 | 02/21/2002 | LETTER FROM COURT TO DEFENDANT RE: THIS LETTER WILL CONFIRM YOUR CONERSATION WITH MY SECRETARY TODAY WHEREIN YOU INDICATED THAT YOU HAVE BEEN UNABLE TO FILE YOUR REPLY BRIEF BECAUSE YOU ARE BUSY WITH THE NEW CASTLE COUNTY "BLITZ". YOU ALSO INDICATED THAT YOU EXPECT TO FILE YOUR REPLY BRIEF BY MARCH 11, 2002. PLEASE LET ME KNOW IF YOUR SCHEDULE CHANGES. | BRADLEY E. SCOTT |
| 91 | 03/11/2002 | LETTER FROM ANDREW WITHERELL TO COURT RE: ADVISING THE COURT THE RESPONSE TO THE STATE'S BRIEF IS NOT COMPLETE. | |
| 86 | 03/18/2002 | LETTER FROM ELENA DELONG AND THE BODNARI FAMILY TO JUDGE BRADLEY RE: ON DEFENDANT'S BEHALF. | |
| 84 | 03/21/2002 | DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR NEW TRIAL FILED BY ANDREW J. WITHERELL, ESQUIRE. (SENT TO CHAMBERS FOR REVIEW) | |
| 85 | 03/21/2002 | NOTICE OF CERTIFICATE OF SERVICE OF THE REPLY IN SUPPORT OF MOTION FOR NEW TRIAL FILED BY ANDREW J. WITHERELL, ESQUIRE. | |
| 87 | 03/21/2002 | LETTER FROM JUDGE BRADLEY TO ELENA DELONG RE:  ADVISING HE IS IN RECEIPT OF HER LETTER DATED 3/12/02.  HE RECEIVED THE REPLY BRIEF TODAY.  HE WILL ISSUE A DECISION WITHIN 90 DAYS. | BRADLEY E. SCOTT |
| 88 | 03/25/2002 | DEFENDANT'S LETTER FILED. TO COURT RE:  REQUESTING A COPY OF THE COURT DOCKET / MAILED TO DEFENDANT ON 3/27/02. | |
| 92 | 05/08/2002 | LETTER FROM ANDRE WITHERELL ,ESQ. TO COURT RE: CASE LAS SUPPORT IN RE: | |

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page    9
                        ( as of  05/31/2005 )

State of Delaware v.  JULIAN BODNARI                    DOB: 02/06/1970
State's Atty: ADAM D GELOF , Esq.           AKA: MIKE L ALLEN
Defense Atty: ANDREW J WITHERELL , Esq.          MIKE L ALLEN


        Event
No.    Date          Event                      Judge
-----------------------------------------------------------------------------
        TO MOTION TO SUPPRESS.
89    06/14/2002                              BRADLEY E. SCOTT
        MEMORANDUM FILED.
        MOTION FOR JUDGE OF ACQUITTAL AND MOTION FOR NEW TRIAL ARE DENIED.
90    06/14/2002                              BRADLEY E. SCOTT
        LETTER FROM JUDGE BRADLEY TO ADAM GELOF AND ANDREW J. WITHERELL RE:
        ENCLOSING MEMORANDUM OPINION DENYING DEFENDANT'S MOTION FOR JUDGMENT
        OF ACQUITTAL AND MOTION FOR A NEW TRIAL.
93    06/21/2002                              BRADLEY E. SCOTT
        LETTER FROM COURT TO ADAM GELOF, ESQ. AND ANDREW WITHERELL, ESQ. RE:
        THIS WILL CONFIRM THAT SENTENCING HAS BEEN SCHEDULED FOR FRIDAY, JULY
        19, 2002 AT 9:30AM.
94    07/11/2002
        LETTER FROM ELENA DELONG (DEFENDANT'S SISTER) TO COURT RE: REQUESTING
        INFORMATION OF THE MOTION THAT WE FILED.
95    07/16/2002                              BRADLEY E. SCOTT
        LETTER FROM COURT TO DEFENDANT RE: ADVISING THE COURT ISSUED IT'S
        DECISION DENYING THE DEFENDANT'S POST-TRIAL MOTIONS ON JUNE 14, 2002,
        WHICH WAS WELL WITHIN THE 90-DAY LIMIT. I WAS NOT PLEASED, EITHER,
        WITH HOW LONG IT TOOK FOR THE BRIEFING TO BE COMPLETED.
        REGARDING THE OTHER MATTERS RAISED IN YOUR LETTER, YOU SHOULD REFER
        THEM TO MR. BODNARI'S ATTORNEY FOR CONSIDERATION.
96    07/19/2002                              BRADLEY E. SCOTT
        SENTENCING CALENDAR - CONTINUED
        DEFENDANT'S REQUEST-DEFENDANT NEEDS MORE TIME.
        DUE TO CORRESPONDENCE FROM AN INMATE.  CORRESPONDENCE MARKED AS
        STATE EXHIBIT # 2.
97    07/22/2002                              GRAVES T. HENLEY
        LETTER FROM JUDY GOFF TO DEFENDANT
        RE: ENCLOSING PAGE FROM COURT TRANSCRIPT THAT DEFENDANT HANDED UP
        DURING SENTENCING.
98    08/15/2002
        DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR NEW TRIAL
        BASED ON NEWLY DISCOVERED EVIDENCE FILED BY ANDREW WITHERELL, ESQUIRE.
        (SENT TO CHAMBERS)
99    09/09/2002
        STATE'S RESPONSE TO MOTION FOR NEW TRIAL FILED BY ADAM GELOF/FORWARDED
        TO CHAMBERS ON 9/10/02.
100   09/11/2002                              BRADLEY E. SCOTT
        LETTER FROM JUDGE BRADLEY TO ANDRE WITHERELL RE:  ADVISING HIM HIS
        REPLY BRIEF IS DUE ON FRIDAY, SEPTEMBER 27, 2002.
103   10/09/2002
```

```
                    SUPERIOR COURT CRIMINAL DOCKET              Page   10
                        ( as of  05/31/2005 )

State of Delaware v.  JULIAN BODNARI                    DOB: 02/06/1970
State's Atty: ADAM D GELOF , Esq.          AKA: MIKE L ALLEN
Defense Atty: ANDREW J WITHERELL , Esq.         MIKE L ALLEN

      Event
No.   Date           Event                              Judge
-----------------------------------------------------------------------------
      AFFIDAVIT OF RONALD PROCTOR
101  10/22/2002
      LETTER FROM ADAM GELOF TO JUDGE BRADLEY AND ANDREW WITHERELL, ESQ.
      RE:  ENCLOSING LETTER FROM RONALD PROCTOR.
102  12/30/2002                              BRADLEY E. SCOTT
      MOTION FOR NEW TRIAL DENIED BY JUDGE BRADLEY.
104  01/07/2003
      LETTER FROM COURT TO DEFENDANT RE:  CONFIRMING THAT AS A RESULT OF
      JUDGE BRADLEY'S DECISION ON THE MOTION FOR NEW TRIAL, SENTENCING HAS
      BEEN RESCHEDULED FOR FRIDAY, JANUARY 24, 2003, AT 11:00 A.M.
106  01/21/2003
      LETTER FROM ANDREW WITHERELL TO JUDGE BRADLEY
      RE: REQUESTING SENTENCING BE MOVED FROM 1/24/03 TO 1/23/03
105  01/23/2003                              GRAVES T. HENLEY
      SENTENCING CALENDAR: DEFENDANT SENTENCED.
107  02/28/2003
      LETTER FROM SUPREME COURT TO ANDREW J. WITHERELL, ESQ. RE: PLEASE FILE
      A COPY OF JUDGE GRAVES JANUARY 23, 2003 SENTENCING ORDER TO BE
      ATTACHED TO THE NOTICE OF APPEAL NO LATER THAN 3-13-03
108  02/28/2003
      LETTER FROM SUPREME COURT #97,2003 TO EILEEN KIMMELL RE: TRANSCRIPT
      MUST BE FILED WITH THE PROTHONOTARY NO LATER THAN 4-7-03.
109  02/28/2003
      NOTICE OF APPEAL FILED BY ANDREW WITHERELL, ESQ. ATTORNEY FOR JULIAN
      BONDARI.  SUPREME COURT #97,2003
110  02/28/2003
      DIRECTIONS TO COURT REPORTER FOR TRANSCRIPT FILED.  SUPREME COURT #
      97,2003
112  03/31/2003
      NOTICE OF RECORD DUE IN SUPREME COURT NO LATER THAN 10 DAYS
111  04/03/2003
      LETTER FROM LISA SEMANS TO JOYCE COLLINS.
      RE:  RECORD DUE 4/10/03.
113  04/04/2003
      RECORDS SENT TO SUPREME COURT VIA STATE MAIL ON 4/7/03
114  04/11/2003
      RECEIPT OF RECORDS ACKNOWLEDGED BY SUPREME COURT.
115  04/30/2003
      TRANSCRIPT OF PROCEEDINGS FILED BY CHRISTINE QUINN, COURT REPORTER
      JANUARY 23, 2003
116  04/30/2003
      NOTICE FROM SUPREME COURT - RECORD IS DUE IN THE SUPREME COURT 10 DAYS
```

SUPERIOR COURT CRIMINAL DOCKET                    Page    11
( as of  05/31/2005 )

State of Delaware v.  JULIAN BODNARI                    DOB: 02/06/1970
State's Atty: ADAM D GELOF , Esq.          AKA: MIKE L ALLEN
Defense Atty: ANDREW J WITHERELL , Esq.         MIKE L ALLEN

```
       Event
No.    Date          Event                         Judge
--------------------------------------------------------------------------
       AFTER RECEIPT OF THIS TRANSCRIPT.
117    04/30/2003
       TRANSCRIPT OF PROCEEDINGS DATED THURSDAY, JANUARY 23, 2003 FILED
       BY CHRSITINE QUINN, COURT REPORTER SENT TO SUPREME COURT
118    05/05/2003
       RECEIPT OF RECORDS ACKNOWLEDGED BY SUPREME COURT ON 5-1-03.
119    12/23/2003
       RECORDS RETURNED FROM SUPREME COURT #97,2003
120    12/23/2003
       MANDATE FILED FROM SUPREME COURT:  SUPERIOR COURT JUDGMENT AFFIRMED.
       SUPREME COURT CASE NO: 97,2003
121    12/23/2003
       IT IS SO ORDERED THAT THE JUDGMENTS OF THE SUPERIOR COURT BE AND THE
       SAME HEREBY ARE AFFIRMED.
       SUPREME COURT #97,2003
122    02/03/2004
       MOTION FOR RELEASE OF EXHIBITS, FILED BY ADAM GELOF, DAG.
123    02/03/2004                          BRADLEY E. SCOTT
       MOTION FOR RELEASE OF EXHIBITS GRANTED
       AND NOW, TO WIT, ON THIS 3RD DAY OF FEBRUARY, 2004, THE FOREGOING
       MOTION HAVING BEEN HEARD AND CONSIDERED, AND UPON REPRESENTATION BY
       THE DELAWARE STATE POLICE THAT CONTRABAND EVIDENCE WOULD BE USEFUL TO
       AN ONGOING CRIMINAL INVESTIGATION, THE STATE'S REQUEST FOR RELEASE OF
       EXHIBIT 18 AND CONSIDERING THE DEFENDANT'S CONVICTIONS WERE AFFIRMED
       BY THE SUPREME COURT,
       IT IS HEREBY ORDERED THAT EXHIBIT 18 BE RELEASED INTO THE CUSTODY OF
       THE DELAWARE STATE POLICE.
124    06/30/2004
       MOTION FOR POSTCONVICTION RELIEF FILED BY DEFENDANT.
125    07/30/2004
       DEFENDANT'S LETTER FILED.
       TO COURT RE:  REQUESTING A COPY OF HIS DOCKET SHEET / MAILED TO DEF.
       ON 8/2/04.
126    08/03/2004                          BRADLEY E. SCOTT
       LETTER FROM JUDGE BRADLEY TO ANDREW J. WITHERELL RE:  ADVISING THE
       DEFENDANT HAS FILED A MOTION FOR POSTCONVICTION RELIEF.  HE IS TO FILE
       AN AFFIDAVIT RESPONDING TO THE ALLEGATIONS SET FORTH IN THE MOTION IN
       ACCORDANCE WITH THE REQUIREMENTS OF SUPERIOR COURT CRIMINAL RULE 61
       (G)(2).
127    08/03/2004                          BRADLEY E. SCOTT
       LETTER FROM JUDGE BRADLEY TO ADAM GELOF RE:  ADVISING THE DEF. HAS
       FILED A MOTION FOR POSTCONVICTION RELIEF, ALLEGING INEFFECTIVE
```

SUPERIOR COURT CRIMINAL DOCKET                Page    12
( as of  03/03/2005 )

State of Delaware v.  JULIAN BODNARI                    DOB: 02/06/1970
State's Atty: ADAM D GELOF , Esq.        AKA: MIKE L ALLEN
Defense Atty: ANDREW J WITHERELL , Esq.        MIKE L ALLEN

```
        Event
No.    Date        Event                              Judge
-----------------------------------------------------------------------
        ASSISTANCE OF COUNSEL AND DISCOVERY VIOLATIONS.  HE IS TO FILE AN
        AFFIDAVIT RESPONDING TO THESE ALLEGATIONS IN ACCORDANCE WITH THE
        REQUIREMENTS OF SUPERIOR COURT CRIMINAL RULE 61 (F).
128    11/12/2004
        MOTION FOR SANCTIONS FILED BY DEFENDANT.
129    11/18/2004
        LETTER FROM JUDGE BRADLEY TO ADAM GELOF, ANDREW WITHERELL
        RE: ADVISING RULE TO SHOW CAUSE HAS BEEN SCHED. FOR 11/24/04 AT 9:30
130    11/23/2004
        MOTION TO COMPEL FILED BY DEF.
131    11/29/2004                              BRADLEY E. SCOTT
        LETTER FROM JUDGE BRADLEY TO DEFENDANT RE:  ADVISING AS HE IS REPRE-
        SENTED BY COUNSEL, HIS MOTION TO COMPEL HAS BEEN FORWARDED TO HIS
        ATTORNEY, MR. WITHERALL, FOR ANY ACTION DEEMED APPROPRIATE BY HIM.
132    11/29/2004
        LETTER FROM ELENA(BODNARI) DELONG TO COURT RE: STATUS OS HER BROTHER'S
        CASE.
133    11/30/2004
        LETTER FROM ANDREW WITHERELL, ESQ. TO JUDGE BRADLEY
        RE: AFFIDAVIT RESPONSE TO DEFENDANT'S MOTION FOR POST CONVICTION
        RELIEF.
134    12/20/2004
        DEFENDANT'S LETTER FILED.
        TO COURT RE: SHOW CAUSE HEARING.
135    02/07/2005
        DEFENDANT'S LETTER FILED TO JUDGE GRAVES
        RE: POST-CONVICTION RELIEF
136    02/25/2005
        DOCKET ENTRY FROM SUPREME COURT ENCLOSING A COPY OF THE WRIT OF
        MANDAMUS FILED IN SUPREME COURT BY THE DEFENDANT.
137    02/28/2005                              BRADLEY E. SCOTT
        MOTION FOR POSTCONVICTION RELIEF FILED BY JUDGE BRADLEY
        MEMORANDUM OPINION - MOTION FOR POSTCONVICTION RELIEF.
138    02/28/2005
        LETTER FROM JUDGE BRADLEY TO SUPREME COURT RE:  ADVISING HE ISSUED HIS
        DECISION ON MR. BODNARI'S MOTION FOR POSTCONVICTION RELIEF TODAY (SEE
        ENCLOSED).  THERE WAS A DELAY IN GETTING THE AFFIDAVITS FROM THE
        ATTORNEYS INVOLVED, BUT HIS DECISION WAS ISSUED WITHIN THE TIME LIMITS
        OF THE "90 DAY LIST". PLEASE CONTACT HIM REGARDING THIS MATTER IF
        THEY HAVE ANY QUESTIONS.

            *** END OF DOCKET LISTING AS OF  03/03/2005 ***
                PRINTED BY: CSCLREM
```



A2

```
                    SUPERIOR COURT CRIMINAL DOCKET                 Page    13
                       ( as of   05/31/2005 )

State of Delaware v.  JULIAN BODNARI                    DOB: 02/06/1970
State's Atty: ADAM D GELOF , Esq.          AKA: MIKE L ALLEN
Defense Atty: ANDREW J WITHERELL , Esq.         MIKE L ALLEN


        Event
No.    Date          Event                          Judge
-----------------------------------------------------------------------------
140  03/29/2005
        NOW, THEREFORE, IT IS ORDERED THAT THE PETITION FOR WRIT OF MANDAMUS
        IS DISMISSED AS MOOT.
141  04/27/2005
        NOTICE OF APPEAL TO SUPREME COURT FILED BY DEF.

            *** END OF DOCKET LISTING AS OF  05/31/2005 ***
                  PRINTED BY: JAGRCJW
```

The verdict can not be argued in the alternative, lenity, as the jury entered convictions on the most serious charges, acquitting on essentially de minimis charges.

With respect to the acquittal on Count 4, the elements of maintaining a Vehicle are argued to be identical in nature. There must be a vehicle that is maintained ( i.e. possessed) knowingly for the purpose of keeping controlled substances. In this case the State was to prove the Defendant knowingly kept (possessed) the vehicle to keep controlled substances.

Defendant argues that the jury acquitted him of this charge because, though he was clearly in possession and control of the vehicle, he was not doing so knowing that it was for the purpose of keeping drugs. Defendant Bodnari did not act knowingly under the circumstances.

## 2.   THE STATE FAILED TO COMPLY WITH SUPERIOR COURT CRIMINAL RULE 16 AND THE CONTINUING DISCOVERY OBLIGATION THEREAFTER.

Pursuant to Superior court Criminal Rule 16(A), upon request of the defendant , the State shall scose to the Defendant and make available... an relevant written or recorded statements made by the defendant or a codefendant or copies thereof, within the possession, custody, or control of there State, the existence of which is known, or by the exercise of due diligence may become known.." The State has the continuing obligation at any time prior to or during trial to notify defense counsel of any additional evidence or material previously requested and subject to discovery.

Present defense counsel requested Discovery pursuant to Rule 16 on or about March 31, 2000. Prior counsel Ronald Phillips, Esquire, requested Discovery on January 13, 2000. The State responded accordingly or at least to the best of counsel's knowledge.

Defense counsel was provided the contents of only one of codefendant Garcia's statements. Specifically, the State provided the transcript of an interview conducted March 10, 2000.

On Cross-examination defense counsel elicited from codefendant Herman Garcia

EX-B          B-1

that he had a lot of interviews. "I had at least three or four". "A couple with the Detective". Upon further review of the record, defense counsel uncovered that there was in fact a videotaped interview of codefendant Garcia on or about the time of arrest. Apparently, at the preliminary hearing of Mr. Garcia the following transpired:

> Q:    (By Adam Sodomsky) Now, the *interview* that was done, was that--and I'm talking about the one *of Mr. Garcia*, was that done on video tape"
>
> A:    (Officer Martinez) That's correct.
>
> Q:    And, you retain a copy of that? And, when I say you, I mean the police.
>
> A:    Yes.

The only statement provided to defendant or defense counsel of either Defendant Bodnari or codefendant Garcia was that of the rather garbled roadside encounter which audio recorded the initial stop. No further video-tape, transcript, notes, or otherwise discoverable material were provided to the defense with respect to this, or any of the other interviews, notwithstanding the disclosure of the March 10, 2000, interview. After review of the file, present counsel was unable to locate any production of the taped interview to Ronald Phillips, Esquire.

Codefendant Garcia did testify before the jury that he had previously lied. But, that is it. Outside of the March 10, 2000, defense counsel was unable to adequately explore the inconsistencies between all of Garcia's statements and exactly what it is that he lied about. The exact contents of and the nature of the lie are far more reaching than a blanket 'I lied'.

Defendant Bodnari argues that he should have been permitted to examine any additional statements and to use them in his defense. Had the contents of each statement made by Garcia been produced he would certainly have been in a far better position to explore Garcia's credibility, or lack thereof, but, also, to explore the statement(s) for exculpatory evidence. Certainly it is conceivable that Garcia simply blame shifted during the progression of his interviews and that early interview would have disclosed other participants, to the exclusion of Defendant Bodnari. For instance, Garcia's trial statement at B226 "Because I didn't want to get a couple other people involved in it" is illustrative

This element was introduced through co-defendant Garcia. To that extent, there is

inconsistency in the balance of the cocaine charges involving the element of knowing

possession.

2.     THE STATE FAILED TO COMPLY WITH SUPERIOR COURT
CRIMINAL RULE 16 AND THE CONTINUING DISCOVERY OBLIGATION
THEREAFTER.

On or about March 31, 2000, defense counsel served upon the state a request for

discovery pursuant to Superior Court Criminal Rule 16. In this request, counsel

specifically identifies that he has already obtained a substantial amount of discovery from

prior defense counsel; however, the discovery may be incomplete. It may be noted that at

the time discovery was provided to prior counsel, the State identified, *at least two*

*relevant audio tapes,* applicable in this case. Defense counsel subsequently requested that

discovery be provided, pursuant to the rule, with the caveat to identify previously

disclosed items so as to avoid duplication, but to protect against omissions. A copy of the

request is attached hereto as Exhibit 'A'.

The State did provide a rather substantial, and on its face inclusive, packet of

information in response to counsel's discovery request. The response included, among

much documentation,  one audio tape, one video tape, and two transcripts of audio

recordings. The audio tape was that of an interview conducted of defendant Bodnari. The

video tape is a tape of Sam Stumhoffer. The transcripts were 1) of the audio recording of

Garcia and Bodnari at the scene of the vehicle stop dated September 19, 1999, and 2) of

an audio recording dated March 14, 2000, with Detective Goode and co-defendant

Garcia. No other transcripts or recordings were provided to counsel through prior defense

B-3

counsel or through this counsel's discovery request. Counsel never received a transcript of the September 20, 1999, Bodnari interview (but did get the audio tape). Counsel never received the audio tape of Garcia and Bodnari at the scene (but did get the transcript). Counsel never received an audio tape of the March 10, 2000 interview of Garcia (but did get the transcript). It seems as if it was one or the other with respect to those statements. Regarding Garcia on September 20, 1999, nothing was received.

Defense counsel was aware that the prosecutor did meet with co-defendant Garcia at least once prior to trial and on the day of trial. Once at the prison with Det. Goode present and once in lock up at the Courthouse. The State communicated that there was no recording of these meetings and that no notes taken. Defendant Bodnari contends that the State could have, and should have, preserved any subsequent statements made by co-defendant Garcia as they were clearly inconsistent with all prior statements. The State failed to preserve yet other inconsistent statements. Co-defendant Garcia testified that his statement in March was not the truth. His plea deal was already in the picture when he gave that interview. He then state he talked to them again, wherein he told the truth. T-B-226. Clearly this is an inconsistent statement from that of March, and presumably that of September 1999. In essence, defendant Bodnari was left with only one, of three, incidents of inconsistent statements from which to impeach co-defendant Garcia. Defendant Bodnari considers it bad faith on the part of the State to intentionally not preserve what would normally be discoverable. After all, they had apparently gone through great measures to record three incidents. did they now simply decide not to record or take supplemental notes?  Maybe the defense should simply have called Mr. Gelof as a witness as he was the sole person speaking with Bodnari prior to testimony. Regardless,

recorded either conversation. He testified from memory with a brief reference to notes as to what each individual stated.

Detective Goode's direct testimony at trial is that co-defendant Garcia, being 'somewhat' deceptive, had stated to him that they were going to Virginia to see *Mooch*. He further stated co-defendant Garcia stopped to pick up some cigarettes and whatnot. T-C-16. The testimony then changed course and the questions to Detective Goode were in reference to the interview of Bodnari. Ultimately, prior to cross examination, defense counsel requested leave to refer to an audio tape to compare the recoding to the notes/testimony of the Detective. The State advised the Court that an audio tape was done with the notes. The tape provided was that of Bodnari. The notes provided were in reference to Bodnari.

In cross examination defense counsel explored the testimony of Detective Goode who admitted to conducting the interview with both defendants the night of the arrest, or very early the next morning. T-C-57. It is abundantly clear now that a formal interview of Garcia had occurred shortly after the arrest.

Cross examination continued of this Detective in line with his prior testimony with no reference whatsoever to an audio tape statement of Garcia or even a report prepared for Garcia. Only to notes. (Again, counsel is unaware of what notes are at issue as the only notes provided to counsel were in reference to Bodnari) It seems quite unusaul that despite having written a full report with respect to Garcia's September 20, 1999, statement the officer relied on only hand sketched notes, apparently contradicting his report, to refresh his recollection. The cross examination of Goode with respect to Garcia was simply that he had been deceptive and that he mentioned Mooch. That was all

that was provided in testimony and to the defense.

At this time counsel has now had the opportunity to review a report, apparently produced by Detective Goode during the course of that interview. The report is essentially a summary of the interview with co-defendant Garcia and not verbatim.

A review of this document reveals information that was not only discoverable but was critical to the preparation and presentation of any defense. I highlight as follows:

1) The Garcia report makes absolutely **no** mention of **Mooch,** contrary to the officers testimony. The report identifies yet another individual "Rashar". Not even close to "Mooch" and certainly no cross reference. This is not only a fact which may be used for impeachment of both co-defendant Garcia and Detective Goode but a lead worth exploring in developing witnesses and theories of the case.

2) The Garcia report indicates that Garcia made a statement that "Sam" who usually drive the car is Mike's (Julian's) girlfriend's brother. Despite receiving attention at the trial the State was able to impeach the credibility of defendant Bodnari's taped statement without the ability for the defense to rehabilitate. Defendant Bodnari is the only person, other than co-defendant Garcia, able to explain the relationship issue. The Bodnari siblings were not familiar with "Sam". The State effectively impeached Bodnari unless he took the stand to explain or, **unless the discrepancy could be cleared through Garcia, though unknown to counsel until this date.**

These are just highlights of what the defense would have considered had it had the opportunity to review the report of Detective Goode and the audio tape of Garcia generated prior to trial. Defense counsel would certainly have been in a better position to impeach co-defendant Garcia than simply referring the generality of his prior

B-6

7

'deceptiveness' or 'lies'.

The trial transcript is quite clear that any specific instance cross examination of co-defendant Garcia was limited to the March 14, 1999 (should be 2000) audio taped transcription of the March 10, 2000, interview with Detective Goode, co-defendant Garcia, Counsel Sodomsky, Counsel Vickers, a paralegal and Mr. Gelof. All relevant cross examination was prepared from and conducted from this prior inconstant statement.

This Court is aware that the testimony of co-defendant Garcia was probably, if not definitely, the must critical portion of the State's case. It can not be disputed that his testimony was absolutely material to any conviction of defendant Bodnari. The evidence, by and large, was not overwhelming but for co-defendant Garcia. Therefore, the impeachment of Garcia was absolutely critical to the case. The degree of impeachability is at issue. By arguing that Garcia was simply deceptive or lieing in the past, the defense was unable to identify with the codefendant the exact nature of the lies and whether the lies actually touched on a material issue of the case. Every change in the progression if his story had reason, i.e additional blameshifting, and each reason was additional evidence which would effect the credibility of co-defendant Garcia.

Defendant Bodnari contends that pursuant to Superior Court Criminal Rule 16 and Brady v. Maryland, 373 U.S. 83 (1963), the State failed to produce to the defense the contents, and more specifically the audio recorded contents, of a prior inconsistent statement of a co-defendant who testified at trial in favor of the State. The prior inconsistent statement of the co-defendant in this action exculpatory as evidence tending to alter the jury's judgment of the credibility of a crucial state witness. Giglio v. U.S., 405 U.S. 154, 154 (1972). "Effective cross examination is an essential right to a fair trial and

B-7

## ANDREW J. WITHERELL

ATTORNEY AT LAW
100 E. 14TH STREET
WILMINGTON, DELAWARE 19801
TEL: 302-655-1943
FAX: 302-427-2414

November 22, 2004

The Honorable E. Scott Bradley
Superior Court
The Circle
Georgetown, Delaware 19947

Re:    State of Delaware v. Julian Bodnari
Cr. ID No.:    0305012760

Dear Judge Bradley,

Please accept this writing as my Affidavit in response to Defendant Bodnari's Motion for Post Conviction Relief.

Factually, Your Honor presided over pretrial matters, trial, and post trial matters. Your Honor has been exposed to the facts of this case and argument throughout. In a nutshell, Defendant Bodnari was the operator of a motor vehicle, not registered or titled to him, which was stopped by law enforcement for speeding. It was subsequently determined that marijuana had been smoked in the vehicle and further inquiry was made. Ultimately, a firearm and cocaine were located in the console of the vehicle. Herman Garcia was the sole passenger in the vehicle. Mr. Garcia made statements, and testified, implicating Defendant Bodnari in the alleged crimes. Mr. Garcia was, as he testified, an eyewitness to Defendant Bodnari's actions with respect to placing the items in the vehicle and/or having full knowledge of their presence. Thus, it is without question that Mr. Garcia was important to the State in the prosecution of Defendant Bodnari.

Defendant Bodnari asserts three (3) issues in his motion. His claims one (1) and three (3) assert Ineffective Assistance of counsel. His claim two (2) asserts a discovery violation, of which this counsel has no knowledge. The facts presented in this claim were not part of the case at the time and have not been communicated to counsel since. Accordingly, counsel views only claims one (1) and three (3) as requiring a response.

As to Defendant Bodnari's first claim, ineffective assistance of counsel, wherein he alleges counsel was ineffective for not securing the September 20, 1999, statement of co-defendant Garia with Detective Goode, counsel responds as follows.

The September 20, 1999, statement of co-defendant Garcia was included in a report prepared by Det. Goode and preserved via audio tape. Counsel continues to represent that he does not recall ever receiving a copy of the audio tape of the statement. The hard copy of the report is now at question and, quite candidly, counsel appears to have been confused as to statement dates and times. Counsel did receive a copy of the

EX-C          C-1

September 20, 1999, statement of co-defendant Garcia in the report of Det. Goode, pre trial. A copy of this report was presented to Defendant Bodnari with all other discovery, and was discussed. In fact, counsel visited Reading, PA, to review travel patterns, the Bitchin Kitchen and to speak with Sam. (Though he refused to admit me into the house or to discuss the matter). This investigation was based largely on this report.

To narrow the issue, please find attached a copy of page 3 of a letter dated June 12, 2003, from Charles M. Oberly, III, Esquire, to Julian Bodnari wherein he references Alleged Discovery Violations. Specifically, Mr. Oberly secured a copy of the audio tape and had it transcribed. In his opinion, there was nothing in the transcribed version that differed to any material extent from the summarized version. Therefore, I will direct further comments to the summarized version (police report).

As previously stated, counsel did receive a copy of the September 20, 1999, report pretrial. Counsel recalls discussing the report with Defendant Bodnari and performing certain investigation consistent with its contents. Counsel recognizes that this representation appears inconsistent with his argument for New Trial, however; it appears arguments are taken out of context and/or there was excusable mistake/confusion.

Counsel's argument was originally directed toward the allegation that Mr. Garcia had been interviewed by Det. Goode "three or four" times. The concern to counsel was fairly obvious, counsel did not receive "three or four" statements from the State issued by Garcia. To the extent they were prior inconsistent statements, counsel's position was that the content should be provided. Alternatively, if they were consistent, I'm not so sure counsel's argument succeeds.

Counsel admittedly became confused upon subsequent submissions. The paperwork in this file was quite extensive and it appears, to the embarrassment of counsel, that the September 20, 1999, report was not filed properly with other statements and thus went unnoticed. As the Court is aware, counsel made an impassioned argument for a New Trial in the absence of this report. The Court has already rejected the argument. Counsel is unaware at this date the circumstances under which, in his reply, counsel noted he had just reviewed the statement.

During the course of trial, counsel is faced with decisions regarding witnesses, testimony, and cross examination, among other things. It is trial strategy. Counsel recalls, and the transcript supports the fact that co-defendant Garcia was heavily impeached. He was attacked on prior inconsistent statements (he admitted he did not tell the truth) and he was attacked on his bias (his deal with the state). Unfortunately for defendant Bodnari, Garcia's statements were, at least on their face, corroborated by many other facts in the action. Counsel always hopes that there is something, one additional question, that will tilt the scales as far possible in his direction. The downside is that counsel also runs the risk that further questions may result in the reinforcement of the State's case. The question for the Court is really at one point has there been effective cross examination?.

The photo line-up was aborted for no other reason than co-defendant Garcia did not cooperate. He did not "bite". It was counsel's decision not to pursue the line of questioning so as to avoid any additional pitfalls.

With respect to "Sam", it is not likely that defendant Bodnari would have taken the stand. In fact, he declined to do so. Any impeachment of Bodnari's statement came upon cross examination by the State in the defense case. Garcia was long gone by this point, though he could certainly have been recalled by the defense. Again, as a strategy matter, would it have been prudent to put Garcia back on the stand without having full knowledge of what he might say? In reality, it was unlikely counsel would recall Garcia to address the "Sam" issue. It could explode. Further, counsel took great measure to discredit Garcia. Would I then be bolstering his credibility, to Bodnari's detriment? Yes. At this point the jury either bought into Garcia or they didn't.

As to Bodnari's third claim, again ineffective assistance of counsel, counsel is unsure of what exactly defendant Bodnari is suggesting. He cites the record (A: Because I didn't want to get a couple other people involved in it, that's why), and then goes on to claim "other people were involved in the conspiracy and this fact was unknown to the defense." Both Ronald Phillips, Esquire, and I, specifically requested Brady information. There was no information provided regarding these "other people". Counsel has absolutely no reason to believe that any other co-conspirator was named to the State. No other names surfaced during prior to or during trial, other than Sam. If Garcia did not want to get others involved, it is consistent that he gave no names. Counsel sees no Brady violation without name(s)/statement(s) exculpatory information. Counsel can not compel the production of information that is non-existent.

Should you have any questions, require additional information, or wish to discuss the above, I will make myself available at the call of the Court.

Thank you for your kind consideration in this regard.

Respectfully submitted,

ANDREW J. WITHERELL

Sworn and Subscribed before me this 23rd day of November 2004.

Viola E. Casey

cc:   Adam Gelof, Esquire
      Julian Bodnari

C-3

Bodnari alleges that the fact that "other people" may have been involved was unknown to him, that it was *Brady* material, and that it should have been disclosed by the State to Bodnari before trial. Bodnari alleges that Witherell should have either asked for a mistrial or demanded that the State immediately disclose all *Brady* material to him. Instead, according to Bodnari, Witherell did nothing. I have concluded that this argument is without merit because there was nothing for Witherell to do.

Witherell stated in his affidavit that he specifically requested that all *Brady* material be turned over by the State. Witherell further stated that there was no information turned over to the defense regarding "other people." Gelof stated in his affidavit that he gave all *Brady* material to defense counsel. Gelof also stated that he was not aware of Garcia ever stating prior to trial that there were "other people" involved in drug trafficking with him that were subsequently convicted of selling large quantities of drugs. As I stated earlier, Garcia did tell the DSP, by using partial names and nicknames, about people who supplied Bodnari with drugs and how Bodnari used other people to deliver and protect the drugs and money. The State gave Bodnari all of these statements before the trial. However, given the denials in Gelof's affidavit and the vagueness of Bodnari's allegations, I have no reason to believe that Garcia ever gave the State any real names of other who were involved with him and Bodnari in distributing drugs. Bodnari has simply not demonstrated that the State withheld any evidence concerning "other people," or how this evidence may have impacted his case. Given this, there was nothing at all deficient in the manner in which Witherell handled this matter.

$EX - D$

10

$D-1$

Delaware State Police
Audio Taped Transcription
March 14, 1999
Det. A. Goode/Garcia

Detective Goode interviewing Herman Garcia. It's March 10th, 2000 at 11:03 a.m.

Q.   Mr. Garcia, I'm gonna go ahead and read you your Miranda warnings. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish one. If you decide to answer any questions, with or without an attorney present, you may stop at any time during the questioning. Do you understand each of these rights I've explained to you?

A.   Yeah.

Q.   Having these rights in mind, do you wish to talk to us now with your counsel present?

A.   Yeah.

A.   *Why don't you state for the record who is* ~~(inaudible)~~ present in the court room.

Q.   *Could everyone say their* ~~(inaudible) say the~~ name please, for the record.

A.   Sure, I'm attorney Allen Sonofsky (phonetic only). I represent Herman *Garcia.* My appearance ~~(inaudible)~~ *is* entered in this case.

A.   I'm Robin (inaudible). I'm a paralegal in attorney Allen Sonofsky's office.

A.   I'm Vinnie Vickers.

Q.   Also present is prosecutor Gelof from the AG's office. I'd like to start out Herman, by getting a little background on how you and Julian, you came to know each other.

A.   Well, (inaudible) ten, eleven years old. He lived around the corner from my dad's house on Walnut Street. He lived on Ninth Street.



EX-E

Q.     You grew up in the same neighborhood, more or less?

A.     Yeah.

Q.     Have you known him since you were eleven as a close friend or just more or less someone you just bumped into?

A.     I've known him pretty good. I know his kids, I know his wife.

Q.     Have you ever, do you have any personal knowledge of how long Julian has been involved in drugs?

A.     A while.

Q.     How long's a while?

A.     Many years. Since I was eleven cause I was doin' things with 'im back then.

Q.     So is that pretty much your relationship with him as far as the drugs are concerned? You would sell drugs for him?

A.     Yeah, I did a lot of pickin' up and givin' stuff away.

Q.     Pickin' up and droppin' off, makin' deliveries for 'im, is that right?

A.     Yeah.

Q.     When did that start?

A.     When I was like eleven, twelve years old, around there.

Q.     What type of drugs was involved here?

A.     Cocaine and marijuana.

Q.     Was it always powder? Was there any crack involved?

A.     No. It was always powder and marijuana.

Q.     When did you start out? What kind of quantities did you move for 'im?

A.    When I first started, it was Ninth and Elm. Used to be a real popular block for ah...sellin' 20's and (inaudible) [Julian] wasn't too big back then. He was just, you know, middle man and I would get you know, like a ounce or two from him and bag it up in 20's and get rid of it.

Q.    How about the past year...what kind of weight were you movin' for Julian?

A.    A lot of weight.

Q.    Are we talkin' pounds, kilos?

A.    Pounds, kilos.

Q.    How would that happen?

A.    How? What you mean? He would call me, tell me, "I'm gonna bring you a present. I'll come and bring you boxes of stuff."

Q.    Were you makin' dropoff's just in the Redding area or did you travel to different states?

A.    Just Virginia. We used to go like from my house to Virginia, you know, cause all the time, he always left everything at my house.

Q.    Did he usually travel with you or did you just...he would get the box to you and you traveled yourself?

A.    No see, before there was another guy that used to do it for him but you know, this time he decided to do it hisself cause the other guy was kinda scared. He left to Mexico and the other dude left for Florida.

Q.    You're talkin' about the night you were arrested in Delaware? Is that what you're referrin' to?

A.    Yeah, yeah.

Q.    So originally someone else was scheduled to ride with you instead of Julian?

A.    Yeah.

Q.     And what exactly led to Mr. Bynard (phonetic only) having to go on the trip?

A      Why?

Q.     Yes.

A      Because I didn't know his friend. The friend we were gonna go drop the stuff off to. See, he had another guy down there, you know, (inaudible) "mark" but he was just down there collectin' money for 'im, you know. "ouch" (inaudible) was a good friend of mine too.

Q.     You know (inaudible) real name?

A.     Rachard (phonetic only).

Q.     Rachard?

A.     Yeah.

Q.     Remember back in September when I asked you who you were going to see, you did mention Rachard bein' the guy's name. You know his last name?

A.     I think it's um...Williams. I'm not sure about the last name too much. I think it's Williams though.

Q.     Is he from the Redding area originally?

A.     Yeah, he's from the Redding but you know...he was like more like a bodyguard I guess you could say.

Q.     Who was the bodyguard for?

A.     For Julian (inaudible)...just to make sure...cause he's ~~about~~ the big guy.

Q.     Who was the friend who was supposed to go down with you, with...you down to Virginia?

A.     I never met that dude.

Q.     You know his name?

A.   No, I don't know his name

Q.   Then why couldn't he go with Julian?

A.   Cause he was scared cause um...a truck that...that thing from Trenton New Jersey got busted with a whole bunch of pounds of stuff on it and um...he got scared that the fed's were gonna be lookin' for 'im cause the one guy that went to pick it up got busted when he went to go pick it up so he fled, he left for Mexico.

Q.   And that was the person that you normally would go down with?

A.   No, this was my first time doin' it, goin' down to Virginia like that cause before, me and Julian just went down with no drugs on us, just to pick up money cause he always had that other guy and another guy go down there and pick stuff up.

Q.   Before you ended up goin' south with Julian, how long before that day which I think was the 19th, did you plan to go down? Spur of the moment or...

A.   No, I think maybe a week or two.

Q.   You knew a couple weeks prior that it was gonna happen, that you were goin' to be goin' to Virginia with 'im?

A.   Yeah.

Q.   How did...what were those conversations? How did they occur?

A.   How did they occur? He'd come to the restaurant, eat lunch, then he'd call me outside on the patio, we'll sit there eat, talk, then he'd tell me what he wants me to do.

Q.   What would he say?

A.   What'd he say?

Q.   Yeah.

A.   First he asked me, you know, "do you wanna come with me", (inaudible) "when are you goin' down there to pick up some money"....let me see, the last, on a Friday, he told me, "look, ~~me and~~ my boy ain't gonna be able to man,

take that shit down there, you know, we're gonna have to do it this time, just borrow your friend Sam's truck."...you know, "cause he got that little secret compartment and we'll go down there."

Q.   How did he know about the truck and the compartment...Sam's...

A.   Cause Sam, he originally...the truck belonged to this other boy. They call 'im...damn, what's his name? Forgot the boy's name that use to own the truck. Well, he's a big drug dealer too, from New York and you know, he used to bring stuff from the truck from New York but then a whole bunch of people ...somethin' happened, a bad deal or somethin'. They broke the windows and all in the truck, they broke all the windows, slashed the tires.

Q.   What? They doublecrossed some dealer and they took it out on the truck?

A.   Yeah, I think so and um...

Q.   So that guy sold it to Sam to sort of (inaudible) ..

A.   Yeah, to get a different car and then Sam bought the truck, and Sam, you know, from goin' through the truck and everything, noticed all the little compartments and stuff and Sam told me and I told Julian about it, you know, he was gonna buy the truck off of Sam really. That's what he was gonna do.

Q.   What was Sam's involvement in the whole thing?

A.   Nothin'. Sam didn't even know we were gonna bring any drugs in.

Q.   Okay, on this deal...but...he had, he's got a truck with compartments in it. Was that with some other dealer?

A.   See, the other dealer, the one that had the truck first...

Q.   What's that guy's name?

A.   See, I don't know his name. I forget his name. (Inaudible)...

Q    You'll remember it. That's okay. Just answer his other questions. By the end, maybe you'll have it. (A #4)

AR 6

Q       From what you understand, Sam knew about the compartments being in the vehicle?

A       Yeah, Sam knew, you know...

Q.      Inaudible...

A.      No, he works. His father owns a construction company.

Q.      When we say compartments, compartments for what?

A.      To bring drugs in the car.

Q.      And in these prior conversations with ah...Mr. Bynard (phonetic only)...what would you describe, how would you describe his truck? The Suburban.

A       I would say, you know, he asked me about my car at first, you know, "come on, let's take your car and go down there" but I was like, "no man, I ain't got nowhere to put that shit in." And so then I was like, "I know somebody that got a truck", I said, "my boy, Sam." I said, "he got a nice truck that got a couple compartments in it that we could take that shit down there and not worry about nothin'."

Q.      Cause you could hide the drugs in the compartments?

A.      Yeah. Hide the drugs in the compartment and he was like..."okay, borrow your boy's Sam's truck. I'm gonna come pick it up. Call me when it gets here." And I talked to Sam and borrowed the truck. Sam left the keys at the store, called Julian up. Julian came picked up the truck.

Q.      ~~Inaudible...~~ When you say the store, are you talkin' about the "Bitchin Kitchen" that your family owns? Yeah.

Q.      Did Mr. Bynard inspect the truck before you guys went down?

A.      Ah, he had to. He had the truck for three days before, you know, we even left Friday.

Q.      Why'd you go over...take me down through it a little more slowly as to how the whole transaction occurred with the truck, when he took the truck, we talked about this conversation. How many days later did you get the truck? Take me through that a little slower.

A.    Well, I got the truck maybe, when was that? I think Wednesday...it was Wednesday or Thursday I got the truck and Sam came in. First I called Sam. I paged 'im, called me back, you know, I said, "yo Sam, can I borrow your truck?" He said, "no problem". He said, "where're you goin'?" I told 'im, "Virginia Beach," and he said, "alright, I'll bring the truck down to you later on" and he came around maybe 2:30, three o'clock. He dropped the keys off, he ate a sandwich and a buddy of his, Mark, made a sandwich, they left the keys and they left.

Q.    Was there anything in it for Sam?

A.    No, Sam, Sam didn't know what we were gonna do. He thought we were just gone on a vacation.

Q.    Were you gonna buy the truck or was Julian?

A.    Julian was gonna buy the truck off of him.

Q.    Did you and Sam have a conversation or Sam and Julian have a conversation about that?

A.    No.

Q.    Well, how did...

A.    It was gonna go through me cause you know, Sam trusted me, you know, I knew Sam since I was in school, you know what I mean? Me and Sam were...

Q.    Did you have a conversation with Sam about buying the truck?

A.    Yeah, he told me, "if you wanna buy the truck,", you know, he paid seven for it but then he paid like two-thousand dollars to fix the windows and stuff and then he told me no, "I'll sell it to you". He told me he'd give it to me for ten grand, what he got into it. He wanted to take out his stereo stuff.

Q.    Okay, so what were your plans (inaudible)...what was communicated to Julian?

A.    inaudible...I told Julian, you know, "I can get the truck, you know, if you like it, you can buy it off of him."

8

Q.    Okay...so then take me through it. We're at the point where Sam drops off the truck. Then what happens?

A.    Sam dropped off the truck. I paged Julian, he calls me back right away and I say, "look, the keys are here for the truck. The truck's out front." He said, "alright, I'll be there in a couple minutes. I'll go pick up one of my friends and take my car back." He came and got the truck and there's some Mexican and he took the truck and left.

Q.    When he took the truck, did...were you out there when he inspected it? Did you show him any of the compartments or anything like that?

A.    No, he just took the truck and left cause he was in a rush. He had some things to do for his businesses.

Q.    What businesses are those?

A.    A bar. He just got a gas station. A couple of things...houses.

Q.    Know anything about a chimney sweep business?

A.    Huh?

Q.    You know anything about a chimney sweep business?

A.    Yeah.

Q.    Does he own that?

A.    No, he don't own that. He, he just used to work for that chimney sweep business to cover up hisself, but now that he got all them houses everything him and his brother got that all covered up.

Q.    So the chimney sweep business was a front for his drug operations?

A.    Yeah.

Q.    It got to the point where he has enough cash that he doesn't need anymore? He's got other businesses started?

A.    Yeah. Cause he was turnin' in that gas station into a...like a Italian Ice restaurant place.

Q.   Is that with drug money?

A.   Yeah.

Q.   How do you know it was with drug money?

A.   How do I know?

Q.   Yeah.

A.   Because he don't get money no other way. He don't work. He never worked for a long time. I was the only one workin'.

Q.   What do you mean by that?

A.   I would work in the kitchen.

Q.   So you were just workin' for him on the side?

A.   No, I was workin' for him, you know...if he needed me to do somethin', there was always two or three of us in the kitchen, you know, I would leave and go pick up what he wanted me to pick up and take...

Q.   (Inaudible)...says on the side, he means, in addition to what you were doing. (Aff#4)

A.   Yeah.

Q.   You worked in the kitchen and in addition (inaudible)...

Q.   What was in it for you? Did you get any benefit out of the situation with Julian? Did he pay you?

A.   Yeah, he paid me.

Q.   Like what would be an example?

A.   Depends on what I was pickin' up. Sometimes I'd pick up marijuana, it would depend on how much.

Q.   When you said pickup, explain...give me an example of how that would happen.

A.     Right. ..he'll tell me, like I'm at the bar. I'll go to his bar, and he might have a package... maybe a hundred, two hundred pounds of marijuana, I'll pick it up and take it where he wants me to take it and I make twenty-five dollars off of each pound. It was always high numbers. He never dealt in small quantities.

Q.     Is that true with the powder too or just...

A.     The powder? Oh, he would get, he'd get like...the most I ever moved for him was like four or five bricks at a time.

Q.     When you say bricks, what are we talking about weight?

A.     Kilos. I think he was getting 'em from California somewhere.

Q.     Now when you say move, you would pick them up from him and drop it off and pick up money?

A.     No, you see he always went and picked up the money. I would just go drop the stuff off, I guess when the guys were done with it, and call him to say, "here, come get your money."

Q.     But you didn't, you're sayin' you didn't exchange money at all with anybody?

A.     Nah, I never exchanged money with nobody.

Q.     Just dropped off?

A.     I just dropped off and picked up, you know, where he wanted me to drop it off at. I would go pick up, say, a package over there...some guy say he couldn't finish the package, I'd have to go back over there, pick up the package whatever's left and then Julian would talk with him later.

Q.     Now you said the relationship started when you were ten or eleven. How long has that type of relationship been goin' on with him?

A.     From there? No, I stopped talkin' with him maybe like...when I was about sixteen, seventeen, cause then I started, I was workin' at Ames and you know...I was doin' good and all of a sudden, you know, I got a girlfriend, a kid, I needed the money, so I started back up with him, you know. By then he was, he was big time now. He was a big man. He had a lot of money.

AR 11

Q.     Twenty-five dollars a pound, was that the price for delivering the weed? (Inaudible) ..

A.     Yeah, the weed.  Ah no, everytime I dropped one of them off, I made anywhere...if I dropped one or two off, you know what I'm sayin', I made like fifteen hundred on each one I dropped off.

Q      Each pound or each kilo?

A.     Each kilo of cocaine.

Q.     When you said drop it off, like how far were you traveling with this stuff?

A.     All around Redden, yeah, all around Redden.

Q.     Alright, we got a little side tracked, getting back to the date, I think we're at the point now where Julian's picked up the truck, ah...the 19th is what day of the week?

Q      I'll tell you in a minute.

A.     Sunday cause (inaudible).. *the day of the De La Hoya Fight.*

Q.     Okay, so he picks up...what day of the week would you say that he picked up the thing? Was it Wednesday?

A.     I think Wednesday or Thursday.  It was one of them days.  I really don't...I forget.

Q.     Now, between Wednesday or Thursday and the time you left, what conversations did you have with him? What was goin' on?

A.     I didn't talk to 'im the whole three days.  He, had some things goin' on with his parents and I think...a birthday party or somethin' cause he told me, you know, "I have to go pick up a ~~suit~~ *tuxedo*, I have this little thing I'm gonna do with my parents birthday." I think it was his mother's birthday.

Q.     He told you that on Wednesday or Thursday?

A.     Yeah, when he picked up the truck.

Q.     "I'm not gonna be in touch for a while. I got some stuff to do?"

A.   Yeah.

Q.   Did you talk on Wednesday or Thursday when he picked it up as to when you would leave and what the plan was?

A.   Yeah, yeah.

Q.   What did you talk about on Wednesday or Thursday when he picked up the truck?

A.   He told me, he said, "wrap that stuff up." He said, "I'm gonna bring somethin' to you, wrap it up and make sure it's wrapped up the right way cause you know, we don't want no dogs or anything to smell it in case of anything" so you know, he told me to put **the** mustard in it and everything, wrap it up for 'im.

Q.   (Inaudible.). when did...that conversation occurred on the Wednesday or Thursday when he picked up the truck?

A.   Yeah.

Q.   He said he was gonna drop off some cocaine?

A.   He didn't say cocaine. He said, "I'm gonna drop off somethin' for you."

Q.   Okay, you understood that to be...

A.   Yeah, to be the drugs.

Q.   Did you understand it to be cocaine or marijuana?

A.   See, at first I didn't know what it was. All he was sayin' was, "I'm droppin' somethin' off to you." And when he bring it, it came in like a little shoebox, like a pair of sneakers. When I opened it up, it was a bag of cocaine.

Q.   Now, going back to the Wednesday or Thursday, before he drops it off...

A.   See, he wudn't the one who dropped it off. This other guy dropped it off and I don't even know that dude. I ain't never seen him before.

Q.   Okay, so I wanna.. be real specific on the conversation on the Wednesday
     or Thursday. He tells you that he's not gonna be around for a while. He's
     got a gig with his parents. What does he say about the plans to go down
     to Virginia? Just in full detail everything that he said.

A.   He said, you know, cause I already knew that we were goin' to Virginia,
     you know. He already told me before that, you know.

Q.   Alright, then I wanna back up to that. When did he tell you that first?

A.   Like a week before, you know... he said um..."you're gonna ride with me
     to Virginia. We're gonna go down there and pick up some money, they
     owe me some money." And he said, "we can go pick up (Much ?) too. He
     said, "cause I don't want  Much (?)  down there no more" cause he said
     there's no need for 'im. He  said, "I got my other boy. He takin' care of
     everything down there, you know." He said I need Much (?) to ride
     around with me in Redden."

Q.   Was there anything in the conversation, now I'm going back to the week
     before this Wednesday or Thursday, about drugs or anything like that?

A.   No because the other guy was supposed to take it.

Q.   So at that point in that conversation, there was another guy that was going
     to bring the drugs down and you were supposed to pick up cash?

A.   Yeah.

Q.   Was the way it was before?

A.   Yeah, before.

Q.   Now the Wednesday or Thursday, because plans changed...

A.   Yeah, because the guy left, he said to Mexico.  There was two
     though.....one went to Mexico and the other one went to Florida.

Q.   So he's sayin' the plans have changed and now...tell me how that
     conversation goes.

A.   He's sayin', "well, we're gonna go down to Virginia," he said, "get ready
     on Sunday night. We're leavin' Sunday night around seven o'clock." So
     you know, I worked in the restaurant. I told 'im, "look, I have to stay in

the restaurant for the...I'm the one who has to close it, you know, I have to call my parents and let 'em know what I'm gonna do, so you know, they can open it up Monday and Tuesday."   And so he came, he said, "alright, I'm gonna call you in a little bit."   He said, "let me know what you're gonna do," and he said, "you know, I'm gonna drop you off a package." So I said, "alright." So he said, "wrap it up and make it so, you know, in case anything happens, nobody can smell the drugs."

Q.    Never had to do that before and...has he asked you to do that type of thing before? Wrap up the package?

A.    Wrap up...no, see when we were in Redden, there was no need to do that cause it was just goin' from one hand to another hand.

Q.    Okay, well how did you know what he meant by that?

A.    What?

Q.    To wrap it up.

A.    To wrap it up?

Q.    Yeah.

A.    To make it good, you know, in case, you know...to wrap it up.

Q.    How did you know what to do?

A.    How did I know what to do?

Q.    Yeah, how'd you know how to wrap it?

A.    Because I know.  You know, I...I did, you know, the way the weed comes, the weed comes in like big blocks. It's all wrapped up in Downey sheets and...

Q.    So you've done it before for Julian?

A.    Oh, I took it out of the wrappin'.

Q.    There you go.  So you've seen cocaine that you had gotten from Julian before wrapped up in the manner that you did?

A.    Yeah. With axle grease all over it and.

Q.    Cocaine too?

A.    Yeah, that's the way the cocaine came, with axle grease, mustard, ziploc bags, tape, then another ziploc bag, tape...

Q.    So you would have that in the past and have to cut it up or...

A.    Have to cut it open, you know, cause there might be a guy that only wanted a half of it, you know...

Q.    So you would do that before hand?

A.    Yeah.

Q.    So that's the way you left it the week before or we're at Wednesday or Thursday now. What's the next thing you hear from Julian?

A.    The next time I hear from him?

Q.    Yeah.

A.    Sunday morning.

Q.    Or how about...when did this package come? How did it come?

A.    Well, the dude bring it to me. I told 'im, you know...first he called me, he say, you know, "where you gonna meet me at?"

Q.    Again, I want specifics. You know the dude, the name?

A.    No, see, that's some guy that just came from Mexico. I don't know him too good. I don't even know 'im.

Q.    Well how did it happen? Where were you? Where did this all take place?

A.    I had to go to the bar and pick it up but I didn't go. I said, "look, I had the restaurant to run, you know what I'm sayin', "just bring it to (inaudible) the trunk of my car."

Q.    When did that call take place?

A.     When?

Q.     Yes.

A.     It happened... I say Saturday.

Q.     This is like the day before it happened?

A.     Yeah.

Q.     And where were you when you got the call, who called, and what happened?

A.     They called me on my cellular phone. (inaudible)...

Q.     Who called you?

A.     That dude.

Q.     This Mexican guy?

A.     Yeah.

Q.     Have you ever talked to this Mexican guy before?

A.     No, he's new, from Mexico, no, I think he's from Texas though. I'm not sure.

Q.     How did...

A.     He speaks good English cause I had to bring my other friend with me to talk to him cause he don't know...

Q.     What, what was the nature of that conversation, again, as much as you can tell us?

A.     Nothing. He just said, "Julian told me to give this to you." That's it. I picked it up.

Q.     Inaudible....I'm going to stop the... interview

Q.     Going to stop?

Q.    Yeah.

Q.    Wanna tell the time?

Q.    Time is 11:30.

Q.    It's now 11:37 a.m.   We're gonna resume the interview with Hermer Garcia.

Q.    I think where we left off was...a conversation with someone you didn't know from Mexico, Texas...about the specifics of dropping off what you believed to be a package.  Go through that with me in detail.

A.    Well...well they called me and told me...

Q.    Where were you when they called you?

A.    I was on my way coming from BJ's, goin' ~~through~~ *to* the kitchen with supplies.

Q.    What time of day was it?

A.    It was probably...probably like four or five o'clock.  Probably later than that, six o'clock.

Q.    Okay, so you're drivin' around?

A.    Yeah.

Q.    Anyone with you in the car?

A.    My one Spanish friend, he was with me.

Q.    Okay, tell me what happens. The phone rings, what happens then?

A.    The cellular rings, you know...he's talkin' in Spanish.  I don't understand all this Spanish.  I don't speak Spanish.  I gave the phone to my boy and he told my boy for me to come pick it up at the bar and I said, "no man." I said, "I can't.  I gotta go back to the restaurant."

Q.    When he said pick it up at the bar, what bar?

A.    Julian's bar.

Q.    What's the name of that bar?

A.    I think it's the Silver Dollar, it's called.

Q.    He owns the Silver Dollar?

A.    No, not Silver Dollar...the Whippin' Post. That's the name of it.

Q.    Did he just buy the Whipping Post?

A.    Yeah.

Q.    Okay.

A.    So you know, I go over there...I go back to the restaurant...

Q.    Inaudible...your boy's right there sayin' that, this Mexican's already (inaudible) and wants you to come by Julian's bar, the Whipping Post, and pick up this package and you tell 'im that you can't.

A.    I tell 'im I can't, you know, I had to go back to the restaurant cause it's busy, you know, so I go back to the restaurant, and tell 'im to just come to the store, you know, come and get my keys and put it in the truck, so he comes and gets my keys, he puts it in the trunk of my car...

Q.    How do you know that?

A.    How I know?

Q.    Yeah.

A.    Because I gave 'im the keys.

Q.    You (inaudible) this Mexican, you've never met this guy before?

A.    No.  He came in with the shoebox.  I already knew what it was.  He opened up my car, threw it in there and left cause he had Julian's red car too, the maroon Nissan.

Q.    So you knew that it was, that he wasn't just some other guy.  He had Julian's car?

A.     Yeah.

Q.     What kind of car was Julian driving?

A.     A Nissan, I think it's a Quest or somethin'.

Q.     And how often had you seen Julian in that car? How'd you know it was his?

A.     Cause he always was in that car. Either that car or he'll be in some rental car. Always had rentals.

Q.     Why was that?

A.     I don't know. He liked to change up all the time.

Q.     Okay, so this Hispanic person drives up in a Nissan Quest. Did you see 'im drive up in it?

A.     Yeah.

Q.     So you could see it from where you were?

A.     Yeah, the kitchen got all windows around the whole thing, you know, I could see...it's about maybe fifty, not even fifty feet, you know. Maybe as long as this table, right here...go through kitchen counter, there's a window right next to it and then where they park is probably at the end of that table right there, right in front of the kitchen. They just pulled up.

Q.     Okay, did you see this guy get...is he by himself?

A.     Yeah, he by himself.

Q.     And he walks out with a shoebox in his hand?

A.     Yeah, he comes in the kitchen with the shoebox in a white plastic shoppin' bag, you know, he came in, he asked me for the keys. I gave 'im the keys, he opened up the trunk and he put it inside. Brings the keys back to me and left, you know. He talked to my Spanish boy cause I don't know Spanish, you know.

Q.     Okay, so like Saturday, the day before you leave, you gave him the keys to your car, he goes out and puts it in your trunk?

A.    In the trunk.

Q.    Okay, what happens next involvin' anything with having to do with you going down to Virginia or this deal, from anyone? Julian or anyone else. What's the next thing that happens?

A.    Sunday morning, Julian called me early in the mornin'.

Q.    Where were you?

A.    I was at home. He called me on my...

Q.    He had your phone number?

A.    No. I never give 'im my home number at all. Called me on my cellular phone, he told me ah..."start packin' your bags and stuff cause I wanna move. I wanna leave early." And I told 'im, "look man, I can't leave early." I said, "I gotta work the restaurant," you know, and he told me, "try to see if your parent's 'll come in today and do the restaurant." I said, "they ain't cause this is their day off." I said, "they've been there all week with me," you know, so you know, we didn't leave....I said, "the earliest I can close the restaurant is seven o'clock or maybe six o'clock," and then..."plus I have to call my parents and let 'em know I'm gonna be gone for two days" and you know, I told 'im I'd get back with 'im. Well, I called my parents and my parents said it was alright, you know, "go ahead and take the trip," you know, "have a nice time on vacation." So I pack my bags, throw 'em in truck, he came...well, when he came, he followed me to my house in the truck. I was in my car. He followed me to my house. I grabbed my bag, I grabbed my coat and I grabbed my insulin and my needles and jumped in the truck. Threw the bag in the back and left.

Q.    Julian was tellin' me, I think I told you this back (inaudible)...that you had ah...supplied the vehicle, that you had actually driven it at some point. Is that true or did...

A.    Drive the vehicle? I drove Sam's vehicle one time before, when I picked up some furniture and...

Q.    Right, but as far as this particular day? Were you drivin'?

A.    No, no.

AR 21

Q.    It was all him?

A.    Yep, all him. I didn't touch that vehicle at all, that whole week.

Q.    So go back through that, how that happens again. How the vehicles get transferred, how the cocaine gets to be in the vehicle, how you get to (inaudible) Virginia.

A.    How we got the vehicle?

Q.    Yeah. Take it through it slow.

A.    Alright...we were talkin' about, you know, he wants to use my car to go down there and I said no. I said, "we can't use my car cause where we gonna put it? Underneath the seats or somethin'?" So you know, that scratched that out of the picture. I said, "look, my friend Sam's got a nice truck", you know, "he'll let me borrow it", you know what I'm sayin'? I said, "as a matter of fact, he even tryin' to sell that if you wanna buy it", so you know, we talked about it a little bit and he said, "go ahead, borrow your friend's truck", he said, so I borrowed the truck, called Sam the next day and Sam said, "yeah, you can borrow the truck, no problem" he said. "just take care of my truck" so you know...

Q.    How'd the dope get from the trunk of your car into the truck?

A.    The next day on Sunday when we went to my house, all's he did was bring the dope out, you know, and put it inside the compartment and took super glue and glued the cup holder down on the truck and that was it and we left.

Q.    So you removed the kilo from the trunk of your vehicle and you handed it to Julian?

A.    Yeah.

Q.    And watched him put it in the console, is that right?

A.    Yeah.

Q.    Well, you packaged it at some point.

A.    Yeah, I packaged it that night before that.

Q.    Was that at the kitchen? Did you use the mustard from the ...hen ... do it or...

A.    The mustard from the kitchen, I bring a jar of mustard with me. I did all that at my house.

Q.    Okay, so the night you got the package from the Mexican guy...

A.    Yeah...

Q.    After you got off work, you took it to your house?

A.    Yeah. I took it to my house that night when I got off from work. I packaged everything up and then I threw it back in my trunk cause I don't keep that shit in my house, you know. I got two little boys in there and that...then that afternoon, you know...let me see, he called me in the morning, I called 'im back in the afternoon and I told 'im you know "my dad says alright, I can take the trip," you know what I'm sayin'? "They told me to have a nice time and stuff" so...you know...

Q.    Where'd the 9 mm come from?

A.    The 9 mm come from?

Q.    Yeah.

A.    Well, I had that with me. It was in the kitchen. I keep that in the kitchen, you know, in case anybody try to rob the kitchen cause Redden got a lot of robberies goes on around there, so you know, I took the 9 mm, I forgot well...cause you know (was smokin) ...I forgot it was with me, you know and I told 'im, "look, what're we gonna do with this? Put it inside the compartment and seal the compartment?" He said, "no."

Q.    But did you seal it? When did you put the gun in the console?

A.    The same time I did...a little bit right after the drugs were in there.

Q.    So when you left the store with the gun, did you keep it in the trunk with the dope?

A.    No.

23

Q.    That night?

A.    No. The gun was um...inside the store cause I never took it home, you know...only on weekends I take it home cause I don't...I knew my parents were gonna be there you know, Monday and Tuesday so you know, they don't like guns and shit like that so I had to take it and do somethin' with it, so I took it with me.

Q.    And that was...was it Saturday or Sunday night?

A.    It was um...Sunday night when I left...closed the restaurant. Closed the restaurant about seven o'clock.

Q.    So you didn't, you didn't have the pistol on you until you actually left?

A.    Until I left the restaurant, yeah.

Q     For the trip?

A.    Yeah.

Q.    You own it?

A.    Do I own that gun?

Q.    *I'm not that familiar w/* (Inaudible) Pennsylvania gun laws and registration, all that, but is the gun registered to you up there?

A.    No.

Q.    Do you know where it came from? Where'd it originate?

A.    Where'd it originate from?

Q.    How'd you get it?

A.    How did I get it? Well...Julian bought it off of some guy and I bought it off of Julian.

Q.    So he sold it to you?

A.    Yeah.

Q.   So before you actually left for the trip, you saw Julian place the kilo in the compartment?

A.   Yeah.

Q.   And then you put the gun on top of it?

A.   No, I put the…well, he…what we did, he tried to tuck the gun in the back, on the side so you know, if anything ever happened, you know, you won't be able to see the gun. We tried to hide it a little bit.

Q.   Was it loaded?

A.   Yeah. There was one in the chamber and 9 rounds I think was in it, cause it's a tin clip.

Q.   So did you discuss exactly what you'd get paid for this particular trip?

A.   For the trip?

Q.   For the trip to Virginia. You said you get about fifteen-hundred.

A.   Yeah, we talked about it, you know…but that's somethin' different because we're goin' a long way, you know. I was gonna make twenty-five hundred on the kilo and then I had to count all the money he had down there, so I was gonna make fifteen-hundred dollars off of that too.

Q.   Where was he supposed to get this money from ah…Rachard (phonetic only) Williams?

A.   No. From the dude that he got the condo in his name in, down there. It's Julian's condo but it's in some other guy's name. I only know him by "J". That's it.

Q.   Is he stayin' with Rachard or is this a different spot altogether?

A.   No, that's um…it's like the same spot but it's like the house next to each other, two condos. Julian got both of 'em. They're both in that guy "J's" name.

Q.   So what exactly were your plans once you got to this area?

A.    He was gonna drop me off with Rachard and what I was gonna do is, I was gonna tell "J" to bring the money over. I count the money and then him and "J" were gonna take care their business.

Q.    So that money that you're talkin' about was separate from whatever deal he was doin' with Rachard?

A.    Yeah. Nah...he wudn't doin' no deal with Rachard. Me and Rachard were countin' the money.

Q.    Where was the kilo goin'?

A.    The kilo was goin' to the guy, "J" down in Virginia, in Norfolk.

Q.    The money they were counting was separate from the kilo they were takin'.

A.    No, that was the day before.

Q.    How much was that?

A.    I think it was like a hundred and eighty-thousand.

Q.    That this person Rachard owed Julian?

A.    No...the guy "J". "J" bring it to the house cause Rachard's his bodyguard, know what I'm sayin'? And we just went down there, we counted the money... we were supposed to count the money. We never made it, you know. But I did it before, you know, count money.

Q.    Down there? Virginia?

A.    Yeah.

Q.    How many trips have you made with him down there?

A.    One time, one time before that. You know, I just went down there to count money and came back. That's it.

Q.    Were you with Julian then or did he send one of his other guys down with you?

A.    No, me and Julian went before, you know. We never carried drugs when we went. You know...that was the first thing, you know what I'm sayin', cause Julian never likes to be involved with that. He always sends somebody else, you know, cause that's why he bring me cause I knew he had somethin' planned like that. If anything happened, I was gonna take the blame.

Q.    Has he ever used his fake name before?

A.    A fake name before?

Q.    Yeah. He gave a different name the night of his arrest, right?

A.    Yeah. He used fake name. See, I didn't remember cause I was high, you know, I was...

Q.    Did he discuss that at all with you, is what I'm tryin' to say.

A.    Yeah...we discussed it on the way goin' down but you know, I was smokin' weed. I wasn't payin' attention to 'im. I thought nothin' was gonna happen. I fell asleep and the next thing I know, he's pulled over to the side of the road, tappin' me wakin' me sayin', "there's a cop behind us."

Q.    When Trooper Martinez pulled the vehicle over, I guess there was somewhere in the area of twenty-two thousand dollars, along with everything else?

A.    Twenty...it was...he had seven-hundred and I had thirteen-hundred. That's (inaudible) man cause...I took it out of the restaurant, cause I needed money for vacation, you know. I couldn't leave the money there overnight.

Q.    Have you bumped into Julian in prison at all since you've been there?

A.    Yeah.

Q.    Do you see 'im everyday or...

A.    Some days, you know sometime in the morning when I go for medication, you know, if he comin' out to get the food cart, so I bump into 'im like that.

Q.    You ever have any conversations when you bump into 'im?

A.    Yeah, we talk. He just keeps tellin' me, you know..."ride it out," he said. "don't say anything. They're gonna keep botherin' you and they're gonna make things look sweet for you but just ride it out. We can beat this case so don't worry about it. My lawyer keeps tellin' me we can win this."

Q.    Did he make any offers to you at all?

A.    When we first got there, first day we got locked up in SCI, we came out, and we were on Unit 4 and we came out for rec, and you know, it was me and I was talkin' to this guy that's my cellmate now, Mr. (Northsd)...we were talkin', you know, and he came over to me and he's like, "look man"...he didn't even eat that day cause he was nervous and stuff, you know. He said, "I'm gonna write this paper and I want you to sign it. I'm gonna send it to the DA. It's no use both of us bein' in here." He said, "you know, I can work things better out on the street." He said you know, "I'm gonna give you some money, eighty-thousand dollars", he said, "who you want me to give it to? Your parents or your girl?" He said, "but I'm gonna take care of your family too, don't worry about it." He said it'd be alright.

Q.    Did he say what was gonna be on the paper he wanted you to sign?

A.    No, he just said, "I wanna send a paper to the DA and I want you to sign it and I just said, "are you crazy" and I walked away so you know, this is the way I see it. I say, either he was gonna do it to me or I was gonna do it to him, you know so....

Q.    What was your impression of your signing this paper?

A.    That he's crazy, I told 'im.

Q.    Right, but what do you think he wanted out of that?

A.    He wanted to go home.

Q.    He wanted you to take the fall for the charges?

A.    Yeah. He wanted me to take the blame for everything. I told 'im the only thing I'm takin' the blame for is the marijuana.

Q.    Did he ever make any kind of threats to you at all or just ...

23

A.     One time he told me before, cause you know, his lawyer, Ronald Fellows (?) went back and told him that I was talkin' with you and this and that, and before I even said anything to you, you know, and he approached me and he said, "you know, remember, I know where your family is" and I told 'im the same thing, "and remember, I know where yours is" and left it at that. And then you know, after that, he tried to scare my parents cause he sent some guys by the store, askin' about the case and stuff.

Q.     How do you feel about 'im, right now? How do you feel about Mr. Bynard?

A.     Scared. He's a powerful guy. He'll make a phone call. My family could be dead, store burnt down. I could probably even get hurt in jail. He can get somebody a couple thousand dollars on their books and somebody'll hurt me for one or two thousand dollars. Two thousand dollars...that'll do a lot of damage to someone.

Q.     Did we miss any dope in that vehicle?

A.     No.

Q.     Do you have any knowledge on where any other kilos were stored?

A.     No cause already, everything's gone because he already made calls and things...

Q.     Prior to him getting arrested?

A.     Yes.

Q.     You had some knowledge of where some extra cocaine was?

A.     No, not no extra cocaine cause that was the last of it. I know that because...

Q.     You said he made some calls though. What was that for?

A.     For the marijuana to get moved cause he knew I knew and he didn't want...you know what I'm sayin'?

Q.     So you wouldn't end up talkin' to somebody?

A.      Yeah. But I know...I think his brother's the one whose runnin' everything right now.

Q.      What's his name?

A.      I don't know his brother's name.

Q.      Where's Julian from originally?

A.      Romania.

Q.      You ever hear of a guy named Caesar?

A.      Caesar? I heard the name, you know what I'm savin', but I never met 'im.

Q.      It didn't ring a bell as far as bein' in contact with Julian in Virginia?

A.      Nah, that's just, I think that's the dude that, you know...in Redden that he gets his shit from. I'm not sure but I think so. Yeah, that is because he always tells me, "I'm gonna go see Caesar."

Q.      What's his last name?

A.      I don't know his last name.

Q.      So you think he's supplyin' Julian?

A.      Probably, yeah. Cause he's always sayin', "I'm gonna go see Caesar." That's the name he always says. "I'm gonna go see Caesar." I know not too long ago they, they were...had a yellow truck. It got busted in Camden. (Inaudible)... Lot of marijuana in that truck

Q.      Anything else?

Q.      That's all the questions I have.

Q.      ~~Inaudible~~.. Keep him safe   (Affny)

Q.      This concludes the interview. It's now ah...11:58 a.m.

(end of tape, Side A/Garcia)

Garcia - Cross                    B-226

1       Q       Mr. Garcia --

2       A       That is when they were investigating the

3   case.

4       Q       In March of this year?

5       A       Oh, no.   That is when I sat and talked with

6   the detective.

7       Q       That is when you didn't give them the

8   straight story; right?

9       A       Because I didn't want to get a couple other

10  people involved in it.   That's why.

11      Q       But then we come up with the deal?

12      A       That deal was already in the picture when I

13  gave them that testimony.

14      Q       But you didn't tell the truth, did you?

15      A       No, I didn't.

16      Q       You just told me now and you just told this

17  jury that you knew you weren't going to get the deal if

18  you didn't tell the truth, and you still didn't tell

19  the truth to him?

20      A       I told him the truth because I talked to him

21  again.

22      Q       If what you are telling us here is a little

23  bit different -- even if it is not substantially

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

C-124'

1   suppose if we're doing the criminal possession of a

2   fictitious license, criminal impersonation, the

3   license was presented to the officer and I believe

4   this is sufficient evidence to go forward.

5           Getting into the forgeries --

6           THE COURT:  So you are admitting 17?

7           MR. WITHERELL:  Seventeen, yes.  Sixteen,

8   Your Honor, could be addressed with the lead charge

9   in the trafficking and the possession with intent to

10  deliver.  And I would just submit to the Court that

11  the State's case is by and large founded on

12  Mr. Garcia, the co-defendant and the alleged

13  co-conspirator.  I recall no independent

14  corroborating features other than Mr. Bodnari was,

15  in fact, in the driver's seat of the vehicle.  There

16  was nothing else that specifically tied Mr. Bodnari

17  to the cocaine package.  There was nothing else that

18  tied him to the gun.  There was nothing that tied

19  him to the razor blade, if, in fact, the razor blade

20  was an issue.

21          Again, no cocaine residue or powder was

22  found within the truck.  We have no officer that

23  could testify that Mr. Bodnari had any specific

1    knowledge that the cocaine and the gun were in the

2    vehicle.  His mere presence in the vehicle is

3    insufficient for a finding of guilt.

4            The State has to prove, obviously, some

5    other elements of the crime, and we would suggest

6    that they have not put forth the prima facie case or

7    the necessary elements or evidence to substantiate

8    the charge.

9            THE COURT:  Notwithstanding Mr. Garcia's

10   testimony to the contrary.

11           MR. WITHERELL:  I recognize Mr. Garcia's

12   testimony, and I'm asking the Court -- the Court

13   heard his testimony.  And although his credibility I

14   guess could be an issue for the jury to determine, a

15   judge can very easily discount testimony if it is so

16   incredulous or so unbelievable or just is something

17   that should not go before the jury.  I believe the

18   judge can take that charge and dispose of that

19   charge.

20           I mentioned that with the conspiracy,

21   because that goes with Charge 1, trafficking.  That

22   leads right into the possession with intent to

23   deliver.  It's essentially the same type of charge.